No. 57,631

GARVEY ELEVATORS, INC., *Appellant*, v. CITY OF WICHITA, KANSAS, A Municipal Corporation, *et al.*, *Appellees.*

No. 57,632

WICHITA UNION STOCKYARDS COMPANY, A Division of Sierra Petroleum Co., Inc., a Kansas Corporation, *Appellant*, v. CITY OF WICHITA, KANSAS, A Municipal Corporation, *et al.*, *Appellees.*

No. 57,763

THE COLEMAN COMPANY, INC., *Appellant*, v. CITY OF WICHITA, KANSAS, A Municipal Corporation, *et al.*, *Appellees.*

(714 P.2d 956)

Opinion filed February 21, 1986.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *John W. Jordan*, of Learned & Jordan, of Wichita, and *Robert W. Coykendall*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, were with him on the brief for appellants Garvey Elevators, Inc., and Wichita Union Stockyards Company.

*Jerry G. Elliott*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued

the cause, and *Wyatt A. Hoch*, of the same firm, was on the brief for appellant The Coleman Company.

*Thomas R. Powell*, senior assistant city attorney, argued the cause, and *John Dekker*, city attorney, was with him on the brief for appellees.

The opinion of the court was delivered by

McFARLAND, J.: Plaintiffs Garvey Elevators, Inc., The Coleman Company, Inc., and Wichita Union Stockyards Company seek to enjoin the defendant City of Wichita from levying and collecting special assessments for a storm water drainage project situated in north-central Wichita. The district court entered summary judgment in favor of defendant City and plaintiffs appeal therefrom.

Originally five owners of land in the benefit district each brought separate injunction actions. These five cases were consolidated in the district court. For reasons unimportant to this decision, two of the cases are not before us. The complex facts involved in this consolidated appeal are not in dispute and were well summarized by the district court as follows:

"Prior to 1965 there was in the northeast part of the City of Wichita an area of low income housing consisting of some 140 contiguous acres. This area was purchased by the Urban Renewal Agency of Wichita, Kansas, Metropolitan Area (42 USCS, Ch. 8A; Slum Clearance, Urban Renewal and Farm Housing) and cleared of all housing, leaving the tract surrounded by industrial development and open land. This tract will be hereinafter referred to as the U.R. (Urban Renewal) tract.

"By 1965 the U.R. tract was located in the approximate south center of an area called the North Wichita Industrial Park. The entire area, including the U.R. tract, contained 1600 acres. Measured east to west, the park was approximately 1 ½ miles wide on the north end and ¾ of a mile wide on the south end. Measured from north to south, the park was two miles long. The southern border was 21st Street North, while the northern boundary followed roughly along an uneven line flexing between 39th and 40th Streets North. Broadway Street was the western border; Grove and the east branch of Chisholm Creek was the eastern border of the Industrial Park. For the purpose of this opinion this tract shall be called the Park. All of the Park could not be developed commercially because a part of it that included all of the U.R. tract was subjected to flooding each time a heavy rain occurred in the area.

"In April of 1965, the Urban Renewal Agency paid for a study done by professional engineers in an effort to define the drainage problems peculiar to the Park.

"A look at the maps furnished by the parties as exhibits shows that this drainage problem was due to the natural lay of the land upon which the Park was located. There is a drop of 30 feet in elevation from the north of the Park to its southern border. Runoff water from rain comes generally from the northeast to the southwest on the northern part of the Park, then straight south or southeast from north on the southern part of the Park. In addition to the runoff water

collected from rainfall within the Park itself, the land to the north and northeast of the Park drains into parts of the Park. The land immediately to the east of the Park drains—by and large—straight south or southwest from straight north or northeast. Rain water runoff from the land east of the Park collects in a natural channel called the east fork of Chisholm Creek. This same creek, as it works southwest, forms the southeast border of the Park. Chisholm Creek, from whence the east fork is named, is located west of the Park. It flows southeast and is joined by the east fork at approximately one city block south of the Park. By and large, the northeast corner of the Park itself drains straight south toward the east fork. In 1965 the east fork carried away the rain water runoff from the northeast corner of the Park.

"The engineers working on the drainage problem for the Park knew that the Kansas Highway Commission (now called the Kansas State Department of Transportation) had plans to construct a four lane, divided, controlled access highway across the Park in a north to south direction. This highway would be a part of I-135, commonly called the 'canal route.' Although the record is not specific on the point, I will find that as a part of the highway plans available to them, the engineers working on the drainage problem would find that the State Highway Commission intended to take earth for fill on the roadway from land located within the eastern part of the Park. This taking of earth would create an excavation in such a place that rain water runoff from the northeast part of the Park would be collected north of the east fork of Chisholm Creek.

"1966 was the year that the City of Wichita authorized payment to private engineers for the preparation of a detailed drainage plan that would fit the needs of the Park. The plan made by the engineers was accepted by the City during 1968.

"The problem could be solved, the engineers reasoned, by a two-step plan. The first step would be the construction of water collection apparatus along the center line of the western half of the Park. These collectors would then drain to the south into Chisholm Creek, which in turn connected with a canal that runs the length of the 'canal route' across the City of Wichita and finally empties into the Arkansas River at 35th Street South between Hydraulic and Hillside. The second step of the solution called for a 'northeast diversion.' The purpose of this step would be to divert rain water runoff coming from within and without the northeast part of the Park away from the remainder of the Park. The first step has come to be known as Main Storm Water Drain No. 14. For purposes of this opinion, it shall be called the 'center drain.' Step two has become known as Main Storm Water Drain No. 50. It shall be called the 'northeast diversion' in this opinion. The private engineers recommended to the City that both steps be done at once with cost spread over the study area.

"The drainage problem could be solved. The plans were drawn. The record indicates that the next problem to be faced by the City was financial. How could the project be paid for? Some Federal money was available through certain grants. Federal regulations regarding the U.R. tract prohibited the levying of special assessments against that tract.

"The City decided to do the center drain first. The cost would be $3,331,523.63. A resolution to begin construction was passed on March 9, 1971.

Two phases of work would be required for the center drain. Phase I would have two parts, Phase II but one part. Here is the cost and the method of financing:

1. Phase I
   Federal grant - Model Cities                $ 465,781.11
   Federal grant - Economic Development
            Administration               1,515,843.41
   Benefit District by Special Assessment     1,096,964.80
2. Phase II
   Urban Renewal Agency              252,934.31

"The main rain water collector for this center drain was to be a large ditch running through the center of the U.R. tract—north to south. The U.R. tract was reduced from 145 acres to 108.14 developable acres. In addition, the entire cost of Phase II—the construction of the main collector on the U.R. tract—was to be paid for by Urban Renewal.

"The special assessment was on 820 acres (33,472,638 square feet). It was done by City Ordinance No. 34-669 in pursuance of K.S.A. 12-6a01, et seq. on September 14, 1976. This ordinance created a benefit district within the Park. There were 1723 pieces of property within the district. Although the U.R. tract was located in the center of the district, it was not a part thereof due to the federal law prohibiting assessments thereon. The benefit district would pay that part of the cost of Phase I not covered by federal money.

". . . The northeast diversion was approved for construction on April 19, 1983. It will be paid for by the City at large. The cost is not known.

"As of April, 1983, the barrow pit that catches water from rain runoff from the northeast part of the Park will, on occasion, overflow, sending the excess water into the center drain.

"The special assessments dictated in the ordinance were made against real property located within the benefit district. The assessments were based upon land value, without regard to improvements, as shown by the Sedgwick County Assessor's roll as of June 1, 1972. Land not on the Assessor's roll as of June 1, 1972 was assessed based on the average square foot value of all lands on said assessment roll.

. . . .

"Within 30 days of the 1976 special assessment, a number of landowners sued, praying for an order of the court enjoining the City from collecting on the special assessment levied by the ordinance of 1976, among other things. Discovery was done and motions for summary judgment were filed.

"The Court, Honorable Ron Rogg, declared the ordinance invalid and 'permanently restrained and enjoined' the City 'from any further acts with respect to said assessment ordinance' (C-38037; C-38014; C-38054). The basis of the ruling was that the assessment scheme used did not result in an imposition of substantially equal burdens upon properties affected. This was all done on October5, 1979. The cases were then dismissed with an order that all discovery done therein could be used in any subsequent cases such as those now at bar.

"February 24, 1981 is the day that the City adopted a new ordinance, No. 37-041, assessing part of the cost for the center drain to landowners in the benefit district. The assessment was done on a uniform square foot basis. This time $1,096,964.80 was the total assessment on 1,361 pieces of property. The per

square foot assessment is .032772. There are 33,472,638 square feet in the district. The benefit district is the same. The U.R. land is not included therein.

"Plaintiff Garvey Elevators, Inc., is a Kansas Corporation. It owns one piece of property in the district. The square footage is 1,293,660; the assessment was $42,395.00.

"Plaintiff Coleman Company, Inc., a corporation, owns 24 properties in the district, covering 2,845,815 square feet. The assessment was $93,263.02.

"Plaintiff Wichita Union Stockyards, a Division of Sierra Petroleum Company, Inc., a corporation, owns two properties within the benefit district. The properties cover 1,179,125 square feet; the special assessment for the center drain was $38,642.27.

. . . .

"Defendant City of Wichita, Kansas is a municipal corporation. It is a city of the first class (K.S.A. 13-101)."

Since the time the summary judgments were entered herein (December 4, 1984), the northeast diversion has been completed with the city at large paying the entire cost thereof.

The first issue is whether it was proper to finance a part of the cost of the center drain project through special assessments.

The plaintiffs note that the defendant City, in making applications to the federal government for construction grant monies, represented that the project was primarily for the benefit of the city at large—particularly the encouragement of new investment and the creation of more jobs for disadvantaged persons in the inner city. The plaintiffs argue that this was either: (1) an admission by the City that the project would benefit only the city at large; or (2) evidence that the City defrauded the federal government by securing federal funds based upon misrepresentations. Plaintiffs also note the engineering reports to the effect that benefit to the property in the benefit district would not support charging the entire cost of the project to the benefit district.

This argument appears to ignore the facts herein. The benefit district is assessed only approximately one-third of the cost of the center drain project—with the balance paid through federal funds. The City applied for and received these funds based on benefits to the city at large. These facts are wholly consistent with the representation the project was primarily for the benefit of the city at large. The engineering studies indicate property in the benefit district would be benefited—but not to the extent of taxing the entire cost of the project to the property therein. It should be noted this issue does not involve the benefit-to-burden ratio on any particular property within the benefit district—

rather, whether it was proper to create a benefit district to pay part of the project cost.

We conclude this issue is without merit.

For their second issue plaintiffs contend defendant City violated K.S.A. 12-6a04 in establishing the benefit district.

Plaintiffs direct our attention to the following portion of K.S.A. 12-6a04:

"(1) Before any contract is let or any work is ordered or authorized for an improvement, the governing body shall by resolution direct and order a public hearing on the advisability of the improvement. Notice of the hearing shall be given by not less than two (2) publications in a newspaper. The two publications shall be a week apart and at least three (3) days shall elapse between the last publication and the hearing. Notice shall be given as to:
(a) Time and place of hearing;
(b) general nature of the proposed improvements;
(c) the estimated or probable cost;
(d) extent of the proposed improvement district to be assessed;
(e) the proposed method of assessment; and
(f) proposed apportionment of cost (if any) between the improvement district and the city at large. The hearing may be adjourned from time to time and until the governing body shall have made findings by resolution as to the advisability of the improvement, the nature of the improvement, the estimated cost, the boundaries of the improvement district, the method of assessment and the apportionment of cost (if any) between the district and the city at large, all as finally determined by the governing body . . . ."

The record is clear no notices were given, hearings held, or findings made as to apportionment of cost as required by K.S.A. 12-6a04.

Plaintiffs do not discuss the final provision of K.S.A. 12-6a04(1) which states:

"*Provided further*, That the governing body may proceed without such notice and hearing, to make findings by resolution as to the advisability of improvements as provided in this section . . . when the proceedings are to improve sanitary and storm water sewers."

K.S.A. 12-6a01(b) defines "to improve" as meaning, in part, "to construct." As the storm drain project herein was within the exception to K.S.A. 12-6a04, it was not error for the City to proceed without holding a public hearing or making a finding relative to apportionment of cost. We conclude this issue is without merit.

The third issue is whether the exclusion of the Urban Renewal tract from the benefit district was arbitrary and capricious.

The Kansas statutory assessment scheme allows a municipality

to levy special assessments on property "in the area deemed by the governing body to be benefited by such improvement for special benefits conferred upon such property." K.S.A. 12-6a02. The assessments are levied against property in an improvement district, which is defined as "an area deemed by the governing body to be benefited by an improvement and subject to special assessment for all or a portion of the cost of the improvement." K.S.A. 12-6a01.

In *Giddings v. City of Pittsburg,* 197 Kan. 777, 421 P.2d 181 (1966), we stated:

"[W]e are fully aware of the duty which rests upon members of the governing body of a city to act fairly and in good faith when fixing the boundaries of an improvement district under the provisions of 12-6a04, *supra.* In other words, the members of a city commission may not abuse the discretion with which they are clothed in determining the area which will be benefited by an improvement. On the other hand, it is a general principle of law that courts do not enjoin the action taken by a city government except in a clear case of an abuse of discretion. (*Engstrom v. City of Wichita,* 121 Kan. 122, 245 Pac. 1033.) In 14 McQuillin, Municipal Corporations, 3rd Ed., § 38.55, p. 171, we find the rule precisely stated:

" 'In the establishment of improvement districts and levying assessments on property therein benefited, within the restrictions of the applicable law, broad discretion is vested in the municipal authorities, and their determination will not be reviewed in the absence of fraud or arbitrary action.' " 197 Kan. at 783.

In *Whitehead v. City of Fredonia,* 235 Kan. 321, Syl., 680 P.2d 286 (1984), we held:

"The power of the courts under K.S.A. 60-907(a) to grant relief in matters of taxes and assessments imposed by the governing body of a municipality is confined to those situations where the action taken by the governing body is without authority, or permeated with fraud, corruption or conduct so oppressive, arbitrary or capricious as to amount to fraud."

It is uncontroverted that federal law prohibits Urban Renewal property from being subjected to special assessments such as involved herein. The construction of the central drain was broken into two phases. Phase II consisted of that portion of the central drain project which was physically located on the Urban Renewal tract. Phase I was the balance of the central drain project. Defendant City negotiated an agreement with Urban Renewal officials whereby the entire cost of Phase II ($252,934.31) was paid by Urban Renewal.

We conclude that the plaintiffs have failed to show the defendant City's exclusion of the Urban Renewal tract entitles

them to any relief under the criteria set forth in *Whitehead v. City of Fredonia.*

The fourth issue is whether the defendant City acted improperly in not computing what the Urban Renewal assessment would have been had it been included in the benefit district and then paying same as a charge against the city at large.

K.S.A. 12-6a07 provides:

"(a) The city may pay such portion of the cost of the improvement as the governing body may determine, but not more than ninety-five percent (95%) of the total cost thereof. The share of the cost to be paid by the city at large shall be paid in the manner provided by K.S.A. 12-6a14.

"(b) If any property deemed benefited shall by reason of any provision of law be exempt from payment of special assessments therefor, such assessment shall, nevertheless, be computed and shall be paid by the city at large."

Plaintiffs contend K.S.A. 12-6a07 required the City to compute the assessment for the Urban Renewal tract on the same square foot basis as the benefit district and pay same from city-at-large funds. Plaintiffs would limit "city at large" to tax monies collected directly by the City from its taxpayers—eliminating consideration of the federal monies received from Urban Renewal officials. Plaintiffs contend the City was required to take the Urban Renewal monies and federal grant monies off the top of project costs and then apply K.S.A. 12-6a07(b) to the balance remaining for which special assessments are required. We do not agree.

The intent of 12-6a07(b) is that a mandated exemption from special assessment of certain property should not result in the nonexempt benefited properties carrying the cost of the benefits received by the exempt property. This result has not been shown to have occurred under the facts herein.

The City contends (and plaintiffs have not disputed this contention) that had: (1) Urban Renewal not made the $252,934.31 negotiated payment; (2) the cost of Phase II (portion of project on Urban Renewal land) been added to the cost assessed to the benefit district; and (3) all property in the benefit district and the Urban Renewal tract been added together and assessments thereon computed on a square foot basis, then the result would have increased the assessments to the assessed property owners and reduced the amount attributable to the Urban Renewal property to a figure less than the $252,934.31 already paid by Urban Renewal. In essence, the plaintiffs are seeking benefits

received by the Urban Renewal property to be twice subtracted from plaintiffs' assessments. Such was not the intention of K.S.A. 12-6a07(b). We conclude this issue is without merit.

For their final issue, plaintiffs Garvey and Wichita Union Stockyards contend the defendant City acted arbitrarily, capriciously and unreasonably in excluding property lying east of the benefit district. Plaintiff Coleman agrees with the defendant City that the land was properly excluded.

As will be recalled from the factual statements previously stated herein, the flooding problem in the industrial park area was to be resolved by two engineering projects. The land on the west side was to have its water problems resolved by construction of the center drain project (Storm Water Drain No. 14). This is the project before us for which special assessments were levied. The land on the east side of the industrial park was to have its water problem resolved by construction of the northeast diversion (Main Storm Water Drain No. 50). The center drain project was completed several years before completion of the northeast diversion. During this period of time, some water from the eastern part of the industrial park (not in the central drain benefit district) drained through the center drain improvement. Engineering studies indicate it may do so again, once every hundred years, in a period of exceptional rainfall.

Was the exclusion of land east of the benefit district arbitrary, capricious or unreasonable? It is true the City was slow to complete the northeast diversion and the city at large paid the entire cost thereof (a much less expensive project than the center drain). However, both projects were discussed in the initial engineering reports and contemporaneous construction was recommended.

We have carefully considered the arguments made relative to this issue and conclude these two plaintiffs have failed to carry their burden of proof that the defendant City's failure to include additional land lying east of the benefit district was arbitrary, capricious or unreasonable.

The judgment is affirmed.

SCHROEDER, C.J., dissenting.