No. 71,925

WILLIAM R. DAVIS· and FERN STULTZ, *Appellees*, v. CITY OF LEAWOOD, KANSAS, *Appellant.*

(893 P.2d 233)

Opinion filed April 21, 1995.

*Richard S. Wetzler* of Bennett, Lytle, Wetzler, Martin & Pishny, L.C., of Prairie Village, argued the cause, and *Patricia A. Bennett*, of the same firm, was with him on the briefs for appellant.

*Thomas S. Busch*, of Holbrook, Heaven & Fay, P.A., of Merriam, argued the cause, and *Lewis A. Heaven, Jr.*, and *John D. Tongier*, of the same firm, was with him on the briefs for appellees.

*Donald L. Moler, Jr.*, general counsel, of Topeka, was on the brief for *amicus curiae* League of Kansas Municipalities.

*Mary F. Carson*, special assistant attorney general, and *Rebecca E. Floyd*, assistant attorney general, were on the brief for *amicus curiae* Robert T. Stephan, Kansas Attorney General.

The opinion of the court was delivered by

ALLEGRUCCI, J.: William Davis and Fern Stultz sued to enjoin the City of Leawood (Leawood) from imposing special assessments on their properties for the purpose of financing the improvement of State Line Road. On cross-motions for summary judgment, the district court granted the injunction on the ground that only city-at-large funds, not special assessments, may be used to improve a designated main trafficway, and Leawood appeals. The appeal was transferred to this court pursuant to K.S.A. 20-3017.

The following facts are not in dispute: William R. Davis resides on property he owns at 11316 State Line Road in Leawood. Fern Stultz resides on property she owns at 11420 State Line Road in Leawood. In 1988, Leawood enacted an ordinance which designated 14 streets, including State Line Road, as "main trafficways" pursuant to K.S.A. 12-685. In March 1993, Hallbrook Farms Associates, L.P., (Hallbrook) pursuant to K.S.A. 12-6a01 *et seq.*, filed a petition with Leawood for the improvement of State Line Road from approximately 112th Terrace to 119th Street. Leawood created the improvement district requested by Hallbrook. The properties of Hallbrook, Davis, and Stultz comprise the improvement district, and State Line Road is being improved where it abuts their properties. At the time the parties' cross-motions for summary judgment were considered, no assessments had been made to the Davis or Stultz properties.

We first determine if Leawood's designation of State Line Road as a main trafficway under K.S.A. 12-685 precludes its financing improvements to State Line Road by special assessments under K.S.A. 12-6a01 *et seq.* The district court decided that special assessments may not be used to improve a designated main trafficway. The decision rests on the district court's construction of state statutes which govern financing of city street improvements.

Among the statutes at issue are K.S.A. 12-685 through K.S.A. 12-690, the Main Trafficway Act, which was enacted in 1959 to authorize cities to designate and improve main trafficways. The pertinent provisions of the Main Trafficway Act state:

"The governing body of any city is hereby authorized and empowered to designate and establish, by ordinance[,] as a main trafficway any existing or proposed street, boulevard, avenue or part thereof, within such city, the primary function of which is, or shall be, the movement of through traffic between areas of concentrated activity within the city or between such areas within the city and traffic facilities outside the city performing the function of a major trafficway. Such designation by the governing body shall be final and conclusive." K.S.A. 12-685.

"The governing body of such city shall have power to improve or reimprove or cause to be improved or reimproved, any main trafficway·or trafficway connection designated and established under the provisions of this act. Such improvement or reimprovement may include grading, regrading, curbing, recurbing, guttering, reguttering, paving, repaving, macadamizing, remacadamizing, constructing, reconstructing, opening, widening, extending, rounding corners, straightening, relocating, building any necessary bridges and approaches thereto, viaducts, overpasses, underpasses, culverts and drainage, trafficway illumination, traffic control devices, pedestrian ways, or other improvements, or any two (2) or more of such improvements or reimprovements and the acquisition of right-of-way by purchase or condemnation when necessary for any of such purposes. The governing body may also employ highway and traffic engineering assistance when necessary to the proper development and planning of such improvement or reimprovement." K.S.A. 12-687.

"All costs of improvements or reimprovements authorized under the provisions of this act, including acquisition of right-of-way, engineering costs, and all other costs properly attributable to such projects shall be paid by the city at large from the general improvement fund, general revenue fund, internal improvement fund, or any other fund or funds available for such purposes, or by the issuance of general improvements bonds." K.S.A. 12-689.

"This act shall be supplemental to all other acts relating to the improvement of streets, and shall not prevent the use of other statutes for the improving of any such street, boulevard or avenue." K.S.A. 12-690.

Also at issue is the General Assessment and Improvement Law, K.S.A. 12-6a01 *et seq.*, enacted in 1957. K.S.A. 12-6a02 provides in pertinent part:

"As a complete alternative to all other methods provided by law, the governing body of any city is hereby authorized to make, or cause to be made, municipal works or improvements which confer a special benefit upon property within a definable area of the city and may levy and collect special assessments upon property in the area deemed by the governing body to be benefited by such improvement for special benefits conferred upon such property by any such municipal work or improvement and to provide for the payment of all or any part of the cost of the work or improvement out of the proceeds of such special assessments as hereinafter provided. Such work or improvements may include the following without limitation because of enumeration:

(a) Acquisition of property or interest in property when necessary for any of the purposes authorized by this act.

(b) To open, widen and extend streets and otherwise to improve paving and other surfacing, gutters, curbs, sidewalks, crosswalks, driveway entrances and structures, drainage works incidental thereto, and service connections from sewer, water, gas and other utility mains, conduits, or pipes necessarily lying within curb lines."

The method used by Hallbrook for requesting improvement of State Line Road is set out in K.S.A. 12-6a04(2), which provides for the filing of a petition by a majority of the resident owners within a proposed improvement district. "Improvement district" is defined in K.S.A. 12-6a01(f) as "an area deemed by the governing body to be benefited by an improvement and subject to special assessment for all or a portion of the cost of the improvement." Leawood authorized the improvement of State Line Road from approximately 112 Terrace to 119th Street pursuant to K.S.A. 12-6a06, which provides in pertinent part:

"The governing body may, by a majority vote of the entire members-elect thereof, at any time within six (6) months after the final adjournment of the hearing on the advisability of making the improvements, adopt a resolution authorizing the improvement in accordance with the finding of the governing body upon the advisability of the improvement, as provided in K.S.A. 12-6a04, which shall be effective upon publication once in the newspaper . . . ."

Apportionment of improvement costs is the subject of K.S.A. 12-6a07:

"(a) The city may pay such portion of the cost of the improvement as the governing body may determine, but not more than ninety-five percent (95%) of the total cost thereof. The share of the cost to be paid by the city at large shall be paid in the manner provided by K.S.A. 12-6a14.

"(b) If any property deemed benefited shall by reason of any provision of law be exempt from payment of special assessments therefor, such assessment shall, nevertheless, be computed and shall be paid by the city at large."

The pertinent provisions which control financing of improvement costs are found in K.S.A. 12-6a08(a):

"The portion of the cost of any improvement to be assessed against the property in the improvement district as determined in K.S.A. 12-6a04, and amendments thereto shall be apportioned against the property in accordance with the special benefits accruing thereto by reasons of such improvement. The cost may be assessed equally per front foot or per square foot against all lots and pieces

of land within such improvement district or assessed against such property according to the value of the lots and pieces of land therein. The value of such property shall be determined by the governing body of the city with or without regard to the buildings and improvements thereon or the cost may be determined and fixed on the basis of any other reasonable assessment plan which will result in imposing substantially equal burdens or shares of the cost upon property similarly benefited."

In this case, the district court stated that it was addressing the interplay between the General Improvement and Assessment Law and the Main Trafficway Act as a matter of first impression. The district court decided that the Main Trafficway Act required the improvement of State Line Road, a designated main trafficway, to be financed with city-at-large funds and that the General Improvement and Assessment Law is restricted to local projects and cannot be used for financing main trafficway improvements. Thus, the district court concluded that there were alternative grounds for enjoining Leawood "from proceeding with its improvement district financing plan for State Line Road." Simply stated, the district court determined the statutes in question to be mutually exclusive in financing street improvements.

The following standards are applied in summary judgment cases:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Hurlbut v. Conoco, Inc.*, 253 Kan. 515, 519-20, 856 P.2d 1313 (1993)." *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994).

With regard to the standard to be applied in cases involving the particular subject matter at hand, this court has stated:

"A challenge to the inclusion of property in a benefit district was made in *Snyder Realty Co. v. City of Overland Park*, [208 Kan. 273, 492 P.2d 187]. The

court there recognized that citizens challenging the action of the governing body of a city must shoulder a heavy burden. The rules have been summarized in *Giddings v. City of Pittsburg*, [197 Kan. 777, 421 P.2d 181,]as follows:

'In defining the boundaries of an improvement district, the members of the governing body of a city are bound to act fairly and in good faith.

'It is a general rule of law that courts will not enjoin action undertaken by city governments unless a clear abuse of discretion has been shown.

'Municipal authorities are vested with broad discretion in establishing an improvement district pursuant to K.S.A. 12-6a04, and in levying assessments against property located therein, and their determination is not subject to review in the absence of a showing of fraudulent or arbitrary conduct.' (Syl. ¶¶ 3, 4, 5.)" *Davies v. City of Lawrence*, 218 Kan. 551, 558, 545 P.2d 1115 (1976).

"[T]he questions of the existence and extent of special benefits are questions of fact to be determined by the authorized governing body. The exercise of the governing body's judgment in this regard is presumed to be legal, equitable and just and only if palpable injustice results from the method applied so that the burden imposed is entirely disproportionate to benefits received will courts intercede. (*Mullins v. City of El Dorado*, [200 Kan. 336, 436 P.2d 837].)" *Board of Education v. City of Topeka*, 214 Kan. 811, 819, 522 P.2d 982 (1974).

The issue of statutory construction, which dominates this case, is subject to unlimited review. *Steele v. City of Wichita*, 250 Kan. 524, 527, 826 P.2d 1380 (1992).

On appeal, Leawood first directs the court's attention to the wording of the statutes at issue. Leawood argues that the statutes are plain and unambiguous. This court has stated: "The fundamental rule of statutory construction is that the intent of the legislature governs." *First Page, Inc. v. Cunningham*, 252 Kan. 593, 601, 847 P.2d 1238 (1993). The intent of the legislature is to be derived in the first place from the words used. *Hunter v. Haun*, 210 Kan. 11, 13, 499 P.2d 1087 (1972). "When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be." *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992). Words in common usage should be given their natural and ordinary meaning. *State ex. rel. Secretary of SRS v. Clear*, 248 Kan. 109, 116, 804 P.2d 961 (1991). In *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989), we stated:

"In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the

entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible."

With the above principles in mind, we first examine the Main Trafficway Act. Both parties suggest that the intent of the legislature is expressed plainly and unambiguously in the language of the legislation, but what Leawood means is that 12-690 is plain and unambiguous and what Davis and Stultz mean is that 12-689 is plain and unambiguous. In fact, it may be more accurate to say that what Davis and Stultz mean is that the phrase "shall be paid by the city at large" from 12-689 is plain and unambiguous.

It is Leawood's position that under 12-685, it designated State Line Road as a main trafficway. K.S.A. 12-687, according to Leawood, gives it the "power to improve or reimprove or cause to be improved or reimproved, any main trafficway." Leawood did not, however, authorize the improvements under 12-687. Instead, the argument continues, the improvements were authorized under 12-6a06, and the improvement district comprised of the properties of Hallbrook, Davis, and Stultz was created under 12-6a04. For this reason, 12-689, which involves "costs of improvements or reimprovements *authorized under the provisions of this act*," does not apply. (Emphasis added.) Thus, pursuant to the authorization in 12-690 for "the use of other statutes for the improving of any such street," Leawood chose to assess State Line Road improvement costs against the properties in the improvement district under 12-6a08. Leawood presents this argument as follows:

"The Main Trafficway Act contains a three step process for making and funding street improvements. First, a city must *designate* a street as a main trafficway. *See* K.S.A. § 12-685 (1991). Second, a city must *authorize* the improvements themselves pursuant to K.S.A. § 12-687. Third, a city *may choose a manner of funding* under K.S.A. § 12-689. A city may also choose other statutes relating to the improvement of streets to make and fund such an improvement. K.S.A. § 12-690."

In an *amicus* brief, the Attorney General supports Leawood in this three-step construction of the Main Trafficway Act. *Amicus* writes that K.S.A. 12-687 contemplates some "official action by the governing body to authorize, describe and provide for the

financing of particular improvements to the street or roadway in question." The official action is the second step, after designation by ordinance, and it "normally takes the form of an ordinance or resolution passed by the governing body." The ordinance or resolution serves as a means of setting forth a description of the improvements, an estimate of costs, and, perhaps, the method(s) of financing. Once the step-two official action has been taken authorizing the improvement under the Main Trafficway Act, the theory goes, the governing body may select financing options under 12-689.

"In the absence of such official action by the governing body, as represented by steps two and three, the Attorney General could not approve such bonds or notes because it would be impossible to tell what the nature of the improvements were, whether they were authorized by K.S.A. 12-687, or what principal amount of bonds or notes the city has authorized to pay for the mysterious improvements."

Thus, in the view of the Attorney General, "K.S.A. 12-689 has no application to improvements to a main trafficway which have not been authorized under the authority of K.S.A. 12-687." Under this theory, the first step—enacting an ordinance designating a street as a main trafficway—may be taken without causing a chain of consequences for future improvements. In contrast, Davis and Stultz contend that once a city governing body has designated a street as a main trafficway, it has irrevocably locked the city into paying the costs for any improvements to that street exclusively by means specified in 12-689.

With regard to the third step, Davis and Stultz argue that Leawood's position ignores the plain language of 12-689, which provides that costs of improvements authorized under the Main Trafficway Act "shall be paid by the city at large." Leawood, as we have seen, contends that 12-689 need not apply here because improvements to State Line Road were not authorized under the Main Trafficway Act. Thus, Leawood's position is that a city may elect to use a source of funding specified in 12-689; Davis and Stultz's position is that 12-689 applies and that its language is mandatory. They cite *Wilcox v. Billings*, 200 Kan. 654, 438 P.2d 108 (1968), for the rule that determining whether the legislature

intended language to be mandatory or directory should be done by considering the entire act rather than isolated provisions. The court stated: "Consideration must be given to the entire statute, its nature, its object, and the consequences which would result from construing it one way or the other." 200 Kan. at 657. For discussion of the meaning of "shall" in a street improvement statute, Davis and Stultz point to *Bell v. City of Topeka*, 220 Kan. 405, 411-13, 553 P.2d 331 (1976). The statute at issue in *Bell* was K.S.A. 13-10,115, and the pertinent language was: "[T]he remaining cost shall be assessed against the adjacent real property, without regard to the value of the improvements, to the middle of the block on either side." 220 Kan. at 411. Although the court's discussion is lengthy, the following is specifically relied on by Davis and Stultz:

"It is true, the word 'shall' when employed in a statute has been read to mean 'may.' (See *Paul v. City of Manhattan*, 212 Kan. 381, 511 P.2d 244; and *Wilcox v. Billings*, supra.) This interpretation of 'shall' has been approved when the term was employed in a statutory provision directing the mode of proceeding by public officers, and the legislative intention was to secure order, system and dispatch in proceedings, and where the rights of parties could not be injuriously affected by the disregard of the particular statutory provision. In this connection we held in *City of Hutchinson v. Ryan*, 154 Kan. 751, 121 P.2d 179:

'In determining whether statutory provisions are mandatory or directory, it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a mode of proceeding and a time within which an official act is to be done, and is intended to secure order, system and dispatch of the public business, the provision is directory.' (Syl. 1.)

In the statutory context in which 'shall' is used in K.S.A. 13-10,115 it is not employed to direct a mode of proceeding and to secure order and dispatch, but rather to declare specifically how assessments shall be taxed with respect to both platted and unplatted land. When the taxing clause is read in the context of the entire statute, it seems clear that the purpose of the legislature could not be accomplished in a manner other than that prescribed. Obviously, the taxing clause in question affects substantial property rights and is the very essence of the things to be done. We have no hesitancy in holding the statutory provision in question to be mandatory." 220 Kan. at 412-13.

In *Bell*, the court gave the following history of Topeka's improving Burlingame Road: Consideration began in 1965. After

several years of studies and public hearings, the city commission adopted Resolution No. 1443 in April 1968. The resolution described the extensive improvements, recited that they would be made under an agreement with Shawnee County, set each governmental entity's share of the cost and the city/benefit district apportionment, and "indicated that the city was proceeding under K.S.A. 13-10,115." 220 Kan. at 407. In July 1968 the city commission passed an ordinance authorizing the improvements in accordance with Resolution No. 1443. "The ordinance recited that no protests, in compliance with 13-10,115, had been filed against the resolution." 220 Kan. at 408. K.S.A. 13-10,115 provides in pertinent part that costs to be borne by the benefit district "shall be assessed against the adjacent real property . . . to the middle of the block on either side." In an effort to standardize irregularities created by the meandering street, the city ignored the express requirement of 13-10,115 and created fictional blocks which reduced the number of parcels to be assessed from 250 to 80. 220 Kan. at 408, 411. The court agreed with property owners within the contrived benefit district that

"the city, once having elected to proceed under 13-10,115, is bound to follow the provisions thereof. It follows that affected property owners are entitled to have their property assessed according to the statutory method, and a substantial departure from the method prescribed by the legislature will invalidate the assessment." 220 Kan. at 411.

Davis and Stultz argue that the court's reasoning in *Bell* with regard to K.S.A. 13-10,115 applies as well to 12-689.

It appears that Davis and Stultz are arguing that 12-690's license to use other acts does not include using them for financing because city-at-large financing of improvements to main trafficways is mandatory under 12-689. If 12-690 has any meaning under this argument, it must be that the statute permits a city to use other acts for purposes other than financing improvements of main trafficways. If this was the intent, it would have been quite simple for the legislature to say so by beginning the section with a reference to 12-689 or with a proviso such as "Except for the financing of costs of improving main trafficways, . . . ." The legislature, however, did not expressly limit the operation of 12-690

to aspects of main trafficway improvement other than financing. Nor do Davis and Stultz flesh out their argument with examples of aspects of improvements other than financing or bring to the court's attention other acts or statutes which, in their view, could be used for the improvement of main trafficways.

In *McCarthy v. City of Leawood*, 257 Kan. 566, 894 P.2d 836 (1995), the central issue was whether the City had authority under the home rule powers to enact an impact fee ordinance. In addressing that issue, it was necessary to determine if the ordinance was in conflict with the Main Trafficway Act. In that determination, we had to interpret K.S.A. 12-689 and K.S.A. 12-690. In *McCarthy*, we said:

"We agree with the landowners that 12-689 and 12-690 are unambiguous. However, as pointed out by the district court:

'Plaintiffs rest their case upon their construction of one section of the Act, K.S.A. 12-689, and they ignore entirely one key phrase in that section. Plaintiffs highlight the following language of the statute: "All costs . . . shall be paid by the city at large . . . ." If that were the entirety of the relevant provisions, plaintiffs would be correct. But plaintiffs ignore this language: "All costs of improvements . . . *authorized under the provisions of this act* . . . shall be paid by the city at large . . . ." (emphasis added.) That language—when construed in conjunction with K.S.A. 12-690—leads to a much different conclusion.'

The landowners not only ignore the above language but also the clear import of K.S.A. 12-690. K.S.A. 12-690 provides that this Act 'shall be supplemental to all other acts' relating to the improvement of streets and 'shall not prevent the use of other statutes for the improving of any such street.' As noted by the district court:

'The Main Trafficway Act comes into play *only when a city has designated a street as a main trafficway*. When no such designation has been made, the Act has no effect whatsoever. Thus, K.S.A. 12-690 is not needed at all in cases in which a street is *not* designated as a main trafficway. Accordingly, to give effect to the legislative intent (and to find meaning in all parts of the statute), K.S.A. 12-690 *must* have meaning in cases in which a designation *has* been made under the Act.

'Plaintiffs simply say that once a designation has been made, all costs must be paid by city-at-large funds. If the plaintiffs' argument were correct, K.S.A. 12-690 would have no meaning in such cases. This interpretation would read K.S.A. 12-690 entirely out of the Act.'

"If K.S.A. 12-690 has any meaning, it must be that the statute permits a city to use other Acts for the purpose of financing improvements to all streets, including those designated as a main trafficway. If this was not the intent, the

legislature could have easily and clearly stated that it was limited to the exclusive financing of main trafficways.

"The landowners argue that the language 'shall be paid by the city at large' in 12-689 is mandatory and not directory. Thus, once a city designated a street as a main trafficway, the city was required to pay for the improvements from at-large funds.

"In this regard, the district court viewed the language of 12-689 not as either mandatory or directory but more as one piece which must be fitted into a whole. There, the district court concluded that the word 'shall' in 12-689, if read to limit a city's power to use alternative financing sources, stripped 12-690 of meaning. In order to harmonize and give meaning to all the various provisions of the Main Trafficway Act, the district court construed 12-690 to permit and 12-689 not to exclude the use of city-at-large financing in conjunction with other forms of financing. It seems quite reasonable to approach the statutory construction in this way where the issue has been posed as one of preclusion or exclusivity rather than mandating or directing. The question is whether cities are precluded from using means of financing not specified in 12-689 or, phrased another way, whether the means specified in 12-689 are exclusive.

. . . .

"K.S.A. 12-689 cannot be construed by itself but must be considered together with K.S.A. 12-690 and other provisions of the Main Trafficway Act. In so doing, we must consider the whole Act and not read one statute in isolation from the other.

"When the two statutes are read together, the district court's interpretation is consistent, harmonious, and sensible. The designation of a street as a main trafficway does not prevent benefits accruing to the landowners within a benefit district. In that event, there is no logical reason to preclude financing the improvements under the general improvement and assessment statutes or the impact fee ordinance. If the legislature had intended the Main Trafficway Act to be an exclusive means of financing a street so designated, then it could easily have said so. We conclude that the Main Trafficway Act does not preclude the use of impact fees together with city-at-large funds to finance the costs of improvements. Thus, we find no conflict exists between the Main Trafficway Act and Leawood's impact fee ordinance."

Davis and Stultz direct our attention to the final sentence of 12-685: "Such designation [as a main trafficway] by the governing body shall be final and conclusive." "If the words 'final and conclusive' are given their natural and ordinary meaning," argue Davis and Stultz, once a main trafficway always a main trafficway. They undoubtedly are correct in this argument, but the question remains whether improvement of a main trafficway may be financed under the General Improvement and Assessment Law

rather than under the Main Trafficway Act. There seems to be general agreement among the proponents of financing options that the purpose of making designations "final and conclusive" is to ensure the viability of bonds which may be issued pursuant to the Main Trafficway Act.

Davis and Stultz rely entirely on the affidavit of Arden Ensley, which they submitted in support of their motion for summary judgment, to explain the meaning of K.S.A. 12-690. Ensley worked as a staff attorney for the League of Kansas Municipalities, which "helped to draft" and lobbied for passage of the Main Trafficway Act. Ensley stated that he "was personally involved in the drafting." Here are the pertinent paragraphs of his affidavit:

"5. Prior to 1959, cities could not authorize issuance of bonds to finance the improvement of roadways with at-large funds without designating them 'main trafficways', 'main arterial trafficways', 'major traffic thoroughfares', 'main thoroughfares' or something similar thereto and qualifying them under one of several pieces of special legislation enacted into law for cities of various sizes.

"6. The main trafficway act of 1959 applied to cities of all sizes and provided a uniform means for financing improvements to designated main trafficways.

"7. K.S.A. 12-690 states that the main trafficway act is supplemental to all other acts relating to the improvement of streets. This section was inserted in the act to assure that the special legislative acts already on the books and not specifically repealed regarding main trafficway improvements would not be invalidated. The act was designed to provide an independent alternative to other financing methods and not as a part of a finance package to be used in combination with other acts; nor was it intended to authorize any other kind of financing of streets designated as main trafficways under this act."

In the district court, Leawood argued that Ensley lacked sufficient personal knowledge of the legislature's intent. The district court disagreed and, in addition, noted that Leawood had not submitted a competing affidavit. The district court concluded: "Although it is the intent of the legislature and not the legislation's proponents that is controlling, the Court finds Mr. Ensley's recollection consistent with the straightforward legislative mandate in K.S.A. 12-689 requiring payment of main trafficway improvements from city at large funds."

Leawood also argues that the affidavit contains allegations which lack proper foundation and therefore would not be admissible in evidence. Leawood contends that it is the legislature's

intention rather than Ensley's which is relevant and that Ensley's affidavit contains nothing showing that he has any basis for knowing what the legislature intended. We find merit in this argument.

Leawood cites *Hand v. State Farm Mut. Auto. Ins. Co.*, 2 Kan. App. 2d 253, 257, 577 P.2d 1202, *rev. denied* 225 Kan. 844 (1978), in which a provision of the Kansas Automobile Injury Reparations Act was at issue. That Act became effective July 1, 1973. In its 1978 opinion, the Court of Appeals wrote:

"We are aware that defendant has presented a recently prepared affidavit of the chairman of the House subcommittee wherein it is said the legislative intent was that survivors' benefits were to replace only the monthly earnings of the deceased actually lost by the survivors. We are unable to square the affiant's statements with the facts of legislative action. We believe the latter speaks more loudly and we are unaware of precedent for judicial ascertainment of legislative intent through statements of legislators made years after the event." 2 Kan. App. 2d at 257.

In the present case, the gap between enactment and affidavit is 35 years rather than the 5 years which the Court of Appeals referred to as "years after the event." And, of course, the affiant is a lobbyist rather than a legislator.

Davis and Stultz would distinguish *Hand* on the ground that Ensley was a draftsman rather than a legislator. They contend that the statements of a draftsman deserve more credit than those of a legislator. In support of this proposition, they first cite encyclopedia statements that a draftsman's word may be considered on conditions prevailing at the time of enactment and on the mischief which the legislation was intended to remedy. There is a statement to this effect in 73 Am. Jur. 2d, Statutes § 177, but it seems apparent from the context that the draftsman contemplated in this section is a legislator. Section 177 is called "Statements of authors or sponsors of bill," with the two treated as one, and the section falls under the heading, "Action or Inaction of Legislators." See 73 Am Jur. 2d, p. 372. Furthermore, statements which are the subject of the section are not post-enactment statements. They are opinions voiced "when the bill was pending" and statements made "in advocating its adoption." 73 Am. Jur. 2d, Statutes § 177.

Also in support of their proposition that a draftsman's statements are more worthy of consideration than those of a legislator, Davis and Stultz contrast the treatment afforded statements in *United States v. Monsanto*, 491 U.S. 600, 105 L. Ed. 2d 512, 109 S. Ct. 2657 (1989), and *Kosak v. United States*, 465 U.S. 848, 79 L. Ed. 2d 860, 104 S. Ct. 1519 (1984). They contend that statements of legislators were rejected in *Monsanto* and the statements of a draftsman were considered in *Kosak*. The statements at issue in *Monsanto* were made after the statute's adoption. 491 U.S. at 610. The statements at issue in *Kosak* were made before enactment. They were contained in a report by a Special Assistant to the Attorney General, who had been assigned the task of coordinating the views of government departments about the scope of a tort claims statute. 465 U.S. at 857 n.13. His draft bill also was contained in the report. With regard to its consideration of the report, the Supreme Court majority stated:

"We agree with the dissent that, because the report was never introduced into the public record, the ideas expressed therein should not be given great weight in determining the intent of the Legislature. [Citation omitted.] But, in the absence of any direct evidence regarding how Members of Congress understood the provision that became § 2680(c), it seems to us senseless to ignore entirely the views of its draftsman." 465 U.S. at 857 n.13.

Dissenting, Justice Stevens wrote: "The intent of a lobbyist—no matter how public spirited he may have been—should not be attributed to the Congress without positive evidence that elected legislators were aware of and shared the lobbyist's intent." 465 U.S. at 863.

Leawood contends that the Kansas Court of Appeals in *Hand* applied the majority rule when it refused to consider post-enactment statements, even of legislators. In *Monsanto*, the United States Supreme Court held that assets which the accused sought to use for attorney fees for his defense were not exempted from restraint or forfeiture by the drug proceeds forfeiture statute. Monsanto relied on comments made by legislators following enactment. Rejecting his position, the Court stated: "As we have noted before, such postenactment views 'form a hazardous basis for inferring the intent' behind a statute." 491 U.S. at 610. In

*Picture Rocks Fire Dist. v. Pima County*, 152 Ariz. 442, 733 P.2d 639 (Ariz. App. 1986), the fire district argued that it was error for the trial court to exclude the deposition of a state senator which it had "offered as evidence of both the legislature's intent with respect to this law and individual legislators' mental processes." 152 Ariz. at 444. The appellate court found no error for this reason:

" 'The rule is clearly established in Arizona that one member of a legislature which passes a law is not competent to testify regarding the intent of the legislature in passing that law.' [Citation omitted.] See also *Tucson Gas & Electric Company v. Schantz*, 5 Ariz. App. 511, 428 P.2d 686 (1967) ('[T]he testimony or opinions of individual members of the legislative body are not admissible.')" 152 Ariz. at 444.

The Maine rule is that "post-enactment comments are not legally cognizable legislative history." *Seven Islands Land Co. v. Maine Land Use Reg.*, 450 A.2d 475, 481 n.9 (Me. 1982). In California, the Court of Appeal stated:

"It is a long-standing principle that we do not consider as evidence in favor of a particular construction of a statute, the motives or understandings of individual legislators who voted for the bill. [Citations omitted.] Nor do we make exception to this rule simply because the legislator whose opinion is offered actually authored the bill." *O'Loughlin v. Workers' Comp. Appeals Bd.*, 222 Cal. App. 3d 1518, 1524, 272 Cal. Rptr. 499 (1990).

As reason for the rule, the court stated that one legislator's understanding of the meaning reflects only his or her personal view and "is not indicative of legislative intent because there is no evidence or assurance that other legislators shared this opinion." 222 Cal. App. 3d at 1523-24. The rule followed in the Indiana courts is more lenient than those already reviewed. There, the journals of the legislative bodies may be considered for the purpose of inferring intent, but "the motives of individual sponsors of legislation cannot be imputed to the legislature, absent statutory expression." *O'Laughlin v. Barton*, 582 N.E.2d 817, 821 (Ind. 1991). The last case cited by Leawood is *Metro Mobile CTS, Inc. v. Centel Corp.*, 694 F. Supp. 806 (D. Kan. 1988), in which a temporary restraining order was granted against the defendant corporation pending consideration of a bill enacted in the 1988 Kansas Legislature. In a footnote, the court stated: "Although

plaintiffs sought to challenge the statute's constitutionality in part by offering affidavits from legislators, the court notes defendant's objection to this kind of evidence and assures defendant that those affidavits played no part in this decision." 694 F. Supp. at 808 n.2.

We find the reasoning and rule stated in the above opinions to be persuasive. This court has said that its "function is to ascertain the legislative intent and purpose, by all legitimate methods, to the end that its will may be made effective." *Clifford v. Eacrett*, 163 Kan. 471, 475, 183 P.2d 861 (1947). Because the post-enactment statements of individual legislators would not be reliable indicators of the legislative intent, their use should not be among the "legitimate methods" sanctioned by this court. An even stronger case can be made for excluding consideration of the post-enactment statements of a lobbyist.

The district court rationalized consideration of the lobbyist's affidavit on the ground that it found "Ensley's recollection consistent with the straightforward legislative mandate in K.S.A. 12-689 requiring payment of main trafficway improvements from city at large funds." This language parallels the proviso in the rule stated by the Indiana Supreme Court: "[T]he motive of individual sponsors of legislation cannot be imputed to the Legislature unless there is a basis for it in its statutory expression." *O'Laughlin v. Barton*, 571 N.E.2d 1258, 1260, *aff'd on rehearing* 582 N.E.2d 817 (Ind. 1991). This rule amounts to no rule at all. It permits a post-enactment statement to be considered if it supports the construction the court is inclined to place on a statute and to be ignored if it does not. The district court should not have admitted Ensley's affidavit into evidence or considered it in determining legislative intent. We conclude the district court erred in holding that the Main Trafficway Act mandated that the costs of improvements to State Line Road be paid with city-at-large funds.

We next consider if the General Improvement and Assessment Law is restricted to "local projects only where the objective is less than city-wide in scope." The district court concluded that 12-6a01 *et seq.* does not authorize improvement district financing for improving main trafficways. The premise of the district court's

analysis was that K.S.A. 12-6a02 restricts the city's levying of special assessments "to local improvements '. . . *which confer a special benefit upon property within a definable area of the city.'* " K.S.A. 12-6a02 provides in pertinent part: "[T]he governing body of any city is hereby authorized to make, or cause to be made, municipal works or improvements which confer a special benefit upon property within a definable area of the city." The district court concluded that a main trafficway, as defined in 12-685, does not fall within the restricted category. K.S.A. 12-685 provides for the designation and establishment as a main trafficway of "any . . . street . . . , the primary function of which is . . . the movement of through traffic between areas of concentrated activity within the city or between such areas within the city and traffic facilities outside the city performing the function of a major trafficway." Referring to the definition, the district court stated: "Consequently, main trafficway improvements are not sufficiently limited in scope to qualify as 'local' for improvement district financing."

The district court found support for its conclusion in the Leawood ordinance by which State Line Road was designated a main trafficway and in an Interlocal Agreement among the cities of Leawood and Kansas City, Missouri, and Johnson County, Kansas. Leawood Ordinance No. 1130 C repeats the main trafficway definition of 12-685. The agreement provides for cooperation among the governing bodies in improving State Line Road from Carondelet Drive to 135th Street. The portion of the State Line Road improvement at issue here is approximately 112th Terrace to 119th Street. The district court quoted the purpose of the agreement as being " 'to assure a more adequate, safe, and integrated roadway network in the developing and incorporated areas of Johnson County, Kansas.' " The conclusion drawn by the district court was stated as follows:

"Significantly, the expansive scope of the State Line project under the *Interlocal Agreement* belies the notion of a local improvement. Clearly, the purpose of these improvements is not to primarily benefit three tracts of land as the City suggests, but instead to serve broader interests. Thus, a major trafficway cannot be considered a local concept."

We find this logic to be flawed. The district court first characterized the discrete improvement of State Line Road as "expansive" in scope due to its being a segment of an integrated roadway network. In this regard the district court offered the justification that even though main trafficways may be constructed and connected in stages, they are general rather than local in nature because that determination depends on "the primary purpose of the improvement." No authority is given for the proposition. Second, the district court generalized from the specific improvement project's being "general" to the conclusion that no improvement to a main trafficway can be "local."

Leawood first contends that the plain language of K.S.A. 12-6a02 supports its using special assessment financing for a main trafficway. It points to the statute's opening phrase, which provides that special assessment financing is "a complete alternative to all other methods provided by law." This argument is not further developed. In *Giddings v. City of Pittsburg*, 197 Kan. 777, 421 P.2d 181 (1966), the court discussed the phrase in the context of a challenge to a benefit district created under K.S.A. 12-6a01 *et seq.* which did not extend to the midpoint of the block on each side of the street to be improved, as required by 12-601. The court stated:

"In 1957, the Kansas legislature, recognizing the practical problems involved in determining what constitutes a 'block' within the meaning of K.S.A. 12-601 in those areas which are platted with artistic design, and realizing the inequities which may result from application of the 'center-of-the-block' assessment method, enacted legislation (now K.S.A. 12-6a01-17) embodying new procedures for the construction of street improvements and the assessment of benefits therefor. This Act (Ch. 99, L. 1957) was intended to provide a complete alternative to other methods of determining benefits and levying special assessments to pay for improvements, as the explicit language of K.S.A. 12-6a02 clearly shows. (See, also, article by Albert B. Martin, 'Survey of Kansas Law: Municipal Corporations,' 8 Kan. L. Rev. 317, 323.)

"Under the provisions of the 1957 Act, the property which is liable for assessment to pay the cost of street improvements is not that which extends to the middle of the block on each side of the street (which formerly we knew as a 'benefit district'), but property which lies within an 'improvement district,' a term which is defined by K.S.A. 12-6a01 (*f*) as follows:

" 'Improvement district" means an area deemed by the governing body to be benefited by an improvement and subject to special assessment for all or a portion of the cost of the improvement.' " 197 Kan. at 781.

Thus, the challenge failed. In *Board of Education v. City of Topeka*, 214 Kan. 811, 814, 522 P.2d 982 (1974), the court stated:

"The 1957 Act, under the provisions of section 12-6a02 coupled with the definitions set forth in 12-6a01, grants broad authority for undertaking all types of municipal improvements initiated either by petition or by a resolution of the city governing body as to the advisability of the proposed improvement. Obviously, with respect to procedure the Act is intended to be complete within itself. It is declared to be a complete alternative to all other methods provided by law whereby the governing body of any city may undertake any improvements or municipal works."

Of course, in 1957 when the General Improvement and Assessment Law was enacted, the Main Trafficway Act of 1959 was not yet another method provided by law by which a city could undertake improvements.

The second part of Leawood's argument centers on the concept of a local improvement. The term "local" does not appear in 12-6a02. It is Leawood's contention that the General Improvement and Assessment Law of Kansas does not limit a city's use of special assessments to improvements which are primarily of local benefit. Instead, according to Leawood, the Kansas statutes permit it to levy special assessments "upon property in the area deemed by the governing body to be benefited by such improvement for special benefits conferred upon such property by any such municipal work or improvement." K.S.A. 12-6a02. Davis and Stultz summarize Leawood's position as: "[E]very street improvement no matter how general in nature does in fact bestow some special benefits on adjoining landowners. The question is merely how much." They contend that this position ignores the statutory requirement that the improvement "confer a *special* benefit upon property within a definable area of the city." (Emphasis added.) K.S.A. 12-6a02. With regard to the benefit-conferred theory of special assessment, Davis and Stultz quote the following statement in 14 McQuillin, Municipal Corporations § 38.02 (3d ed. rev. 1987):

"The foundation of the power to lay a special assessment or a special tax for a local improvement of any character is the benefit which the object of the assessment or tax confers on the owner of the abutting property, or the owners of property in the assessment or special taxation district, which is different from the general benefit which the owners enjoy in common with the other inhabitants or citizens of the municipal corporation."

Based on this theory, this court has stated:

"A special assessment, therefore, is in the nature of a tax levied against property according to the benefits conferred. While the property is made to bear the cost of the improvement, it or its owner suffers no pecuniary loss thereby since, theoretically at least, the property is increased in value by an amount equal to the tax levied against it. (*State Highway Commission v. City of Topeka*, [193 Kan. 335, 393 P.2d 1008].)

"The whole theory of special assessments is demonstrated by the language found in the early and oft cited case of *Norwood v. Baker*, 172 U.S. 269, 43 L. Ed. 443, 19 S. Ct. 187:

'. . . the principle underlying special assessments to meet the cost of public improvements is that the property upon which they are imposed is peculiarly benefited, and therefore the owners do not, in fact, pay anything in excess of what they receive by reason of such improvement. . . .'" *Mullins v. City of El Dorado*, 200 Kan. 336, 341, 436 P.2d 837 (1968).

Leawood quotes and discusses several opinions from other states' courts in which an improvement's generally benefiting a community did not preclude a city's assessing abutting property which derived some direct benefit from the same improvement. Davis and Stultz chide Leawood for its reliance on cases from other jurisdictions, but they do not cite any Kansas cases in which this particular question was fully adjudicated.

Davis and Stultz cite *Madden v. City of Lenexa*, 239 Kan. 397, 721 P.2d 261 (1986); *Becker v. City of Wichita*, 231 Kan. 322, 644 P.2d 436 (1982); *Bell v. City of Topeka*, 220 Kan. 405, 553 P.2d 331 (1976); *Davies v. City of Lawrence*, 218 Kan. 551, 545 P.2d 1115 (1976); *Board of Education v. City of Topeka*, 214 Kan. 811, 522 P.2d 982 (1974); *Snyder Realty Co. v. City of Overland Park*, 208 Kan. 273, 492 P.2d 187 (1971); *Mullins v. City of El Dorado*, 200 Kan. 336; and *Giddings v. City of Pittsburg*, 197 Kan. 777. The main issue in all these cases is either the composition of an improvement district or the computation of assessments.

In *Mullins* and *Bell,* there were secondary issues which are somewhat related to the question in the present case whether the street improvement's generally benefiting the city precludes financing by special assessment. The *Mullins* property owners argued that the newly constructed sewer should have been considered a main sewer, in which case much of the cost could have been paid by the city at large under K.S.A. 12-619. 200 Kan. at 347. This court disagreed on the ground that the city's evidence showed that it "was designed as a lateral system to serve only the property in the districts." 200 Kan. at 347-48. In *Bell,* the property owners argued that the costs of intersections with "designated major traffic thoroughfares," 29th and 37th Streets, should not be charged to the benefit district. The intersections included "extensive median strips and left-hand turn lanes, and all purpose traffic signals." 220 Kan. at 418. The property owners argued that the city commission passed a binding motion deleting the intersection costs from the benefit district. A review of the proceedings showed that the city commission referred the matter to the Engineering and Finance Departments for reevaluation, that the city answered plaintiff's declaratory judgment petition by denying it intended to include the intersection costs in the special assessments, that in a special session a motion passed to continue the public hearing for 30 days for further study of the intersection question, and that the "commission never formally terminated the matter of reconsidering the intersections question." 220 Kan. at 419. The court concluded:

"[T]he admissions and indecisiveness of the city commission, as shown by the circumstances related, considered together with insignificance of the benefits, if any, resulting to local residents from the thoroughfare intersections, we believe, compel the conclusion that the assessment of any part of the costs of the intersections against the benefit district would result in palpable injustice." 220 Kan. at 419.

In response to the property owners' further argument that the assessments were grossly disproportionate to any special benefits to their property, the court stated:

"We believe the argument is particularly persuasive with respect to the intersections in question. Where intersections, such as those in question, are de-

signed, primarily to control the pattern and flow of through traffic into and across the intersections of major thoroughfares, the benefit, if any, to adjacent property is obviously negligible in comparison to the city at large." 220 Kan. at 419.

Here is the court's rather cautious statement of its holding:

"Under the particular facts and circumstances surrounding the city's actions concerning the intersections in question, viewed together with the extreme disproportion of the burden imposed to the benefits received, we hold that the assessment of any costs of the 29th and 37th Streets intersections against the benefit district property is arbitrary and unreasonable and that such assessment must be enjoined." 220 Kan. at 420.

Leawood cites *Posselius v. City of Detroit*, 44 F.2d 395 (E. D. Mich. 1930); and *In re City of Woodstock*, 115 Ill. App. 3d 502, 450 N.E.2d 960 (1983).

In *Posselius*, owners of abutting properties objected to special assessments for the costs of improving Vernor Highway, which runs entirely across Detroit. The ordinance authorizing the improvement stated that the highway was "to provide to crosstown traffic a direct route whereon crowded downtown streets may be avoided and relieved." 44 F.2d at 396. One-half the cost "was assessed against the general public and spread upon the general tax rolls," and the other half was assessed against the properties fronting on the street. 44 F.2d 395. In ruling against the property owners, the district court stated:

"I am unable to agree with the contention of the plaintiffs that, because the primary purpose of this highway project was to provide a through, main thoroughfare across the city, and thus to benefit the general public in such city, it was solely a general improvement, as distinguished from a local improvement, so that entire costs must be defrayed from general taxes and no part of such cost could legally be assessed specially against the land abutting on such highway. The nature of a special assessment is too well understood to require discussion here. It was concisely stated by the Supreme Court in *Illinois Central Railroad Co. v. Decatur*, 147 U.S. 190, 198, 13 S. Ct. 293, 294, 37 L. Ed. 132, as follows: 'Special assessments or special taxes proceed upon the theory that, when a local improvement enhances the value of neighboring property, that property should pay for the improvement.'

"It is equally clear that when such an improvement produces a special benefit, other than the benefit received by the general public, to certain land in the vicinity of the improvement, the mere fact that it also results in benefit to the general public, or even the fact that its immediate occasion or purpose was the creation of the general improvement project of which it is a part, does not

deprive it of its character as a local improvement nor prevent the imposition of at least a portion of its cost as a special assessment against such land. [Citations omitted.]

"If, therefore, the improvement project here involved did specially benefit the land of the plaintiffs in question, it manifestly constituted a local improvement sufficient to justify the special assessment levied, notwithstanding the fact that it arose from a desire by the people of the defendant city to obtain the general benefits which also flowed from the highway improvement project of which it was, incidentally, a part." 44 F.2d at 397-98:

Whether the value of the abutting properties was enhanced by the street improvement is a question committed to the discretion of the legislative tribunal, *i.e.*, a city's governing body, and its decision "will not be disturbed by the courts in the absence of a clear showing that such decision was wholly arbitrary, merely capricious, or actuated by fraud or bad faith." 44 F.2d at 398.

In *Woodstock*, 115 Ill. App. 3d at 505, 85% of the costs of improving a street were apportioned to the public and 15% to assessed properties. The project included widening a street and installing new storm sewer, curb, gutter, and sidewalk. It improved the condition of the street and access to the downtown area. One of the issues presented for appeal was whether the improvement was a local one within the meaning of a provision of the Illinois Constitution, which empowers non-home rule units to make local improvements by special assessments. The property owners argued that the improvement was "not a local one in that its primary purpose is to benefit the public and it only incidentally benefits the private properties affected." 115 Ill. App. 3d at 506. The court disagreed: "[D]espite the conceded benefit to the public, there was sufficient specific private benefit directed to the objectors' property as distinguished from the municipality as a whole to be derived from the street improvements." 115 Ill. App. 3d at 508.

The question whether improvements which confer benefits on the public may be financed in part by special assessments based on a special benefit conferred on properties within a definable area was before this court in *Garvey Elevators, Inc. v. City of Wichita*, 238 Kan. 682, 714 P.2d 956 (1986). In *Garvey*, a drain project was conceded by the city to be primarily for the benefit

of the city at large. Nonetheless, this court rejected the property owners' argument that, in the circumstances, creation of a benefit district to pay part of the project cost was improper. 238 Kan. at 686-87.

Leawood points out that K.S.A. 12-6a07(a) provides: "The city may pay such portion of the cost of the improvement as the governing body may determine, but not more than ninety-five percent (95%) of the total cost thereof." According to Leawood, this provision demonstrates that the legislature contemplated that the General Improvement and Assessment Law would be used for improvements with far less than 100% benefit to the assessed land.

We agree with Leawood. We find no support for the district court's determination that K.S.A. 12-6a01 *et seq.* is limited to projects which do not predominantly or primarily benefit the city at large. There is no language in 12-6a01 *et seq.* which supports such limitation. On the contrary, K.S.A. 12-6a07 provides for special assessments notwithstanding that up to 95% of a project is paid for by city-at-large funds. Financing street improvements under 12-6a01 *et seq.* is not an all or nothing proposition. Property within an improvement district may be specially assessed for improvements that provide benefits separate from those received by the city at large. Rarely, if ever, will property which abuts a street or road improvement not be specially benefited to some extent. The existence and to what extent the properties are specially benefited are for the city to determine. That is true notwithstanding that the primary purpose of the project is to benefit the city as a whole. We conclude that the General Improvement and Assessment Law can, in part, be used to finance improvements to a street or road which as been designated as a main trafficway under K.S.A. 12-685.

Another aspect to Leawood's argument is that "whether a special benefit is actually conferred upon a property is not to be determined at summary judgment stage." Leawood states that the value conferred on property by an improvement is to be used in computing the amount of an assessment under K.S.A. 12-6a08. Leawood seems to suggest it therefore follows that the district

court's deciding, before considering the amount of the assessment, that the primary benefit of the improvement does not fall on the property of Davis and Stultz was premature. Leawood also suggests that the district court judge improperly preempted the City by deciding the question whether and to what extent the properties were benefited. In this regard, this court has stated:

"Ordinarily, the question of the existence and extent of special benefits resulting from a public improvement for which a special assessment is made is a question of fact to be determined by the governing body authorized to act in the premises, and is considered conclusive on the property owners and the courts." *Mullins*, 200 Kan. at 342.

In *Board of Education*, 214 Kan. at 819, the court reiterated: "[T]he questions of the existence and extent of special benefits are questions of fact to be determined by the authorized governing body." These statements were made in cases where the court's principal concern was with the city's valuation for special assessments rather than with whether the improvement conferred special benefit on the properties. In *In re City of Woodstock*, 115 Ill. App. 2d 502, where the threshold question was whether street improvement conferred special benefit on abutting properties, the Illinois appellate court applied essentially the same rule stated in the Kansas cases:

"It has been established that whether a given improvement is a local improvement within the meaning of the constitution is primarily a matter for determination by the corporate authorities. While whether such an improvement is local or general is a question of law, the question of whether the facts in a particular case bring an improvement within the definition of a local improvement is one of fact to be determined by the circumstances established by the evidence. However, the corporate authority's determination that a given improvement is a local improvement within the meaning of the constitution is subject to review by the courts. (*Johnson v. Village of Bellwood* (1930), 388 Ill. 605, 608-09.) The objectors contend that the standard of establishing that a municipality was arbitrary and unreasonable, when challenging a special assessment, applies to the issue of whether an improvement is necessary but not to the issue of whether an improvement is local. However, in *Illinois Central R.R. Co. v. City of Decatur* (1894), 154 Ill. 173, 176, the court found that the power of a city council or board of trustees to declare what shall be local improvements is necessarily implied from the power to make the same in the mode and by the means prescribed in the statute and that a municipality may not declare such an improvement arbitrarily and unreasonably and without reference

to benefit. Thus, since deciding when particular circumstances bring an improvement within the definition of a local improvement is a legislative function, as the city urges, that determination will not be overturned unless arbitrary or unreasonable." 115 Ill. App. 3d at 507.

In the present case, implied in Leawood's proceeding under K.S.A. 12-6a01 *et seq.* is its determination that the State Line Road improvement conferred special benefits which would support special assessments on the Davis and Stultz properties. The district court redetermined this fact question without reference or deference to the City's legislative authority and entered summary judgment, which would be proper where the only questions presented were questions of law. In these respects, Leawood is correct in contending that the question whether a special benefit actually is conferred on property is not properly determined on a motion for summary judgment.

Finally, Leawood contends that the challenge to the amount of the assessment was premature. Davis and Stultz alleged that Leawood had violated K.S.A. 12-685 *et seq.*; in Count II, they alleged that Leawood had violated K.S.A. 12-6a02 by creating the improvement district because their "properties are not specially benefited by such improvement." The prayers are identical in the two counts:

"WHEREFORE, plaintiffs pray the Court grant the following relief:

"(1) Enjoin the defendant City of Leawood, Kansas from (a) entering into any contract or doing any act in regard to the improvement of State Line Road Phase II that is dependent upon the levy of special assessments, and (b) levying any special assessments, taxes or charges against the plaintiffs' properties for the payment of improvement costs for State Line Road Phase II;

"(2) Order that the resolution of the defendant creating the State Line Road Phase II improvement district be set aside and vacated;

"(3) Order that the State Line Road Phase II improvement costs be paid by the defendant from an at-large source; and

"(4) Grant them such other and further relief as the Court deems just, appropriate, and equitable in the premises, including their costs and expenses incurred herein."

Davis and Stultz filed a motion for partial summary judgment, seeking an entry of judgment on Count I of their petition. Leawood filed a motion for summary judgment. The district court's journal entry of judgment noted that the motion of Davis and

Stultz was for the entry of summary judgment on Count I, and it stated that "plaintiffs' motion for summary judgment is granted" and that Leawood "is permanently enjoined from proceeding with its improvement district financing plan for State Line Road." In its brief in this court, Leawood states that the district court's "ruling necessarily mooted the plaintiffs' second argument that their properties were not benefited by the improvement." We agree. The district court's ruling in plaintiffs' motion for partial summary judgment necessarily encompassed or mooted Count II of their petition. Thus, the entry of summary judgment was a final judgment on all claims. Reversing the summary judgment and remanding operates to revive Count II.

The district court's entry of summary judgment is reversed, and the case is remanded with directions to grant judgment to Leawood on Count I and for further proceedings on Count II.

HOLMES, C.J., and ABBOTT, J., not participating.

DAVID PRAGER, C.J. Retired, and ROBERT H. MILLER, C.J. Retired, assigned.