The Honorable John Edmonds State Representative, 112th District 209 N.E. Ten Road Great Bend, Kansas 67530
Dear Representative Edmonds:
As Chairman of the Legislative Post Audit Committee, you request our opinion as to "the legality of the lease-back arrangement and other agreements which appear to be designed to help Cabela's recoup much of the cost of constructing its retail store in Wyandotte County." The Committee is concerned with whether these agreements violate K.S.A. 2004 Supp. 12-1773(b) and 12-1770a(q), which prohibit using sales tax and revenue bonds (STAR bonds) to construct buildings that are to be owned by or leased to a developer.
According to a performance audit report recently completed by the Legislative Division of Post Audit,[1] various agreements between the Unified Government and Cabela's will result in Cabela's recouping all but a little over $1 million of the $34 million cost to build its store in Wyandotte County:[2] $15 million from STAR bond proceeds was used by the Unified Government to build and furnish an aquarium, mountain display and other wildlife exhibits within the Cabela's store;[3] $14 million will be paid by the Unified Government to Cabela's under the terms of the "Theatre Lease";[4] and Cabela's has or will realize roughly $4 million from the sale of excess land that was purchased by the Unified Government using STAR bond proceeds for the Cabela's project, but was not needed and therefore re-sold by Cabela's to other businesses locating in Village West.[5] It is these latter two transactions about which you inquire.
The Theatre Lease
The Performance Audit Report describes the Theatre Lease arrangement as follows:
 "The Unified Government plans to spend $20 million in STAR bond moneys to build an upscale movie theater in Village West. . . . It has signed a contract to lease the land upon which the theater will be built to Cabela's for $1. It also signed a second contract to lease the land back from Cabela's for $14 million over 24 years.
 "Of the $14 million in lease payments, $7.5 million (plus interest) will come from future theater revenues, and $6.5 million (plus interest) will come from the Board of Public Utilities as part of its incentive package to get businesses in the Village West district to go all-electric.
 "Unified Government officials told us this lease-back arrangement was part of an economic incentive package designed to help Cabela's recoup much of the cost of constructing its own store. This lease agreement is structured like a loan, so the Unified Government will pay Cabela's an estimated $31 million in principal and interest over the 24 years of the lease."[6]
The Report concludes that this lease-back arrangement appears to circumvent the portion of the law that prohibits use of STAR bonds to construct buildings that will be owned by or leased to a developer. "Although no STAR bond moneys are directly used to make the lease payments to Cabela's, more than half the $14 million in lease payments to Cabela's will come from future theater revenues — revenues that wouldn't exist if STAR bonds hadn't been used to build the theater."[7]
Responding to this portion of the Performance Audit Report and statements made at the Post Audit Committee's hearing to discuss the Report, a representative of the Unified Government states:
 "We believe that the nature and purpose of the lease-leaseback arrangement between the Unified Government and Cabela's was mischaracterized in the Audit and at the Joint Committee meeting on February 14.
 "The original lease is [a] fairly typical ground lease, pursuant to which the unimproved ground is leased from the owner of the ground (i.e., the Unified Government) to Cabela's. The term `ground lease' is defined in Black's Law Dictionary as `a lease of vacant land, or land exclusive of any buildings on it, or unimproved real property.' In this transaction, the ground lease is only a lease by the Unified Government of the unimproved ground to Cabela's. Subsequently, pursuant to the `lease-back' document in which Cabela's leases that same property back to the Unified Government, Cabela's is leasing back to the Unified Government the same unimproved raw ground. The Unified Government is then building the Theater upon this property. The Unified Government still owns the ground in fee title, possesses the ground pursuant to the `lease-back' arrangement, and [ ] owns the Theater building improvements for the term of this lease. When the Unified Government satisfies its $14M incentive obligation to Cabela's, this entire structure — both the ground lease and the lease-back — is dissolved. This arrangement is very similar to a mortgage in that Cabela's (like a lender) does not have any present interest in the ground or the improvements during the term in which the owner of the property (i.e., the Unified Government) is making the required payments.
. . . .
 "In the Unified Government-Cabela's structure, the ground is leased from the Unified Government to Cabela's and then back to the Unified Government as `collateral' to secure the payment of the $14M incentive. However, the Unified Government alone has the right to build, maintain, own and possess the improvements constituting the theater building during the lease-back arrangement.
 "The sole purpose of the lease-leaseback agreements is to secure the Unified Government's commitment to provide a portion of the economic incentives required to induce Cabela's to locate within the major tourism area. As noted in the Audit, of the $14 million in lease payments, $7.5 million (plus interest) will come from future theater revenues and $6.5 million (plus interest) will come from the Board of Public Utilities. NO PORTION OF THE INCENTIVES SECURED BY THE LEASE-LEASEBACK AGREEMENTS WILL BE DERIVED FROM STATE SALES TAX REVENUES OR ANY OTHER STATE FUNDS.
. . . .
 ?"[N]o STAR bond proceeds were used or will be used to construct Cabela's retail store."[8]
We have reviewed the Base Lease, the Theatre Lease and the Amendments to both and find the above statements regarding the terms of those Leases to be substantially accurate: Pursuant to these agreements, the Unified Government is leasing land to Cabela's for a term of 75 years in consideration of $1 and other agreements;[9] Cabela's is leasing the same land back to the Unified Government for a term of 24 years in consideration of $14 million plus interest over a 24 year period;[10]
the Unified Government is to construct a theater on the land, the proceeds from which are the sole means of payment for $7.5 million of the $14 million "rent" (the remaining $6.5 million to be paid by the Board of Public Utilities pursuant to a utility economic incentives agreement);[11] Cabela's gains possession of the land and the Theatre Improvements on the land only if the Unified Government defaults on the Theatre Lease and does not cure that default within a specified time period;[12] both the Base Lease and the Theatre Lease terminate upon payment of the $14 million plus interest or upon the expiration of the 24 year term, whichever occurs first;[13] we find no provision in the lease agreements whereby Cabela's will or can ever acquire ownership of the theater building or become the lessee of the building.
While the Lease agreements do not so indicate, we are told that STAR bonds will or have been used to pay for purchase of the land on which both the Cabela's store and the theater sit, construction of the theater and other costs, but that no STAR bonds were used directly to pay for construction of the Cabela's store.[14]
Resale of "Excess" Real Property
According to the Performance Audit Report:
 "The Unified Government used STAR bond moneys to buy the property for Village West and gave it to the venture partners to develop. Both Cabela's and RED Development negotiated to receive more land than they needed for their developments. . . . Both have sold much of the excess land to other businesses or developers for more than $300,000 per acre [for a total of $4,120,927 to Cabela's]."
Discussion
The stated purpose of the statutes authorizing issuance of STAR bonds[15] is "to promote, stimulate and develop the general and economic welfare of the state of Kansas and its communities and to assist in the development and redevelopment of eligible areas within and without a city thereby promoting the general welfare of the citizens of this state, by authorizing cities to acquire certain property and to issue special obligation bonds and full faith and credit tax increment bonds for the financing of redevelopment projects. . . ."[16] A redevelopment project is pursued by a city under the Tax Increment Financing (TIF) Act through a two-step process, the first of which is to establish a redevelopment district within an eligible area.[17] Once the redevelopment district has been established, the city's governing body may adopt an ordinance that sets forth the redevelopment district plan.[18] The "`redevelopment district plan' or `district plan' [is] the preliminary plan that identifies all of the proposed redevelopment project areas and identifies in a general manner all of the buildings, facilities and improvements in each that are proposed to be constructed or improved in each redevelopment project area."[19] A city is authorized to issue special obligation bonds in one or more series to finance the undertaking of certain redevelopment projects in accordance with the provisions of K.S.A. 12-1770 et seq.,[20] and may issue full faith and credit tax increment bonds to finance the undertaking of any redevelopment project under the TIF Act.[21] These bonds are to be made payable by one or more of the methods listed in K.S.A. 2004 Supp. 12-1774, which may include a pledge of all revenue received by the city from any transient guest, state and local sales and use taxes collected from taxpayers doing business within a redevelopment project area that has been determined will be a major tourism area.[22] Bonds made payable in this way are what are commonly referred to as STAR bonds.
K.S.A. 2004 Supp. 12-1773 provides in part:
 "(a) Any city which has adopted a project plan in accordance with the provisions of this act may purchase or otherwise acquire real property in connection with such project plan. . . .
 "(b) Any property acquired by a city under the provisions of this act may be sold, transferred or leased to a developer, in accordance with the project plan and under such other conditions as may be agreed upon. Such city may use the proceeds of special obligation bonds issued under K.S.A. 12-1774, and amendments thereto, or full faith and credit tax increment bonds issued under K.S.A. 12-1774, and amendments thereto, or any uncommitted funds derived from those sources set forth in paragraph (1) of subsection (a) of K.S.A. 12-1774, and amendments thereto, to pay the redevelopment project costs as defined in K.S.A. 12-1770a, and amendments thereto, to implement the project plan."[23]
K.S.A. 2004 Supp. 12-1770a(q) defines "redevelopment project costs" as:
 "[T]hose costs necessary to implement a redevelopment plan or a bioscience development project plan, including, but not limited to costs incurred for:
 "(1) Acquisition of property within the redevelopment project area;
"(2) payment of relocation assistance;
"(3) site preparation including utility relocations;
"(4) sanitary and storm sewers and lift stations;
 "(5) drainage conduits, channels, levees and river walk canal facilities;
 "(6) street grading, paving, graveling, macadamizing, curbing, guttering and surfacing;
"(7) street light fixtures, connection and facilities;
 "(8) underground gas, water, heating and electrical services and connections located within the public right-of-way;
"(9) sidewalks and pedestrian underpasses or overpasses;
 "(10) drives and driveway approaches located within the public right-of-way;
"(11) water mains and extensions;
"(12) plazas and arcades;
"(13) parking facilities;
 "(14) landscaping and plantings, fountains, shelters, benches, sculptures, lighting, decorations and similar amenities; and
 "(15) all related expenses to redevelop and finance the redevelopment project.
 "Redevelopment project costs shall not include costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer, however, the `redevelopment project costs' shall include costs incurred in connection with the construction of buildings or other structures to be owned or leased to a developer which includes an auto race track facility or is in a redevelopment district including some or all of the land and buildings comprising a state mental institution closed pursuant to section 2 of chapter 219 of the 1995 Session Laws of Kansas."[24]
Clearly, pursuant to K.S.A. 2004 Supp. 12-1773(a), (b) and 12-1770a(q)(1), a city may use the proceeds from STAR bonds to purchase land within the redevelopment project area and, pursuant to K.S.A. 2004 Supp. 12-1773(b), a city may lease or sell such land to a developer in accordance with the project plan. Thus, it appears that the purchase of the Theatre Land with STAR bond moneys and subsequent lease of that land to Cabela's was within the realm of what the statutes contemplate. When necessary to promote a public purpose, it is generally accepted that municipalities have the power to become the lessee of property.[25] Thus there appears to be nothing inherently improper about the Unified Government leasing property from Cabela's. Additionally, the purchase of "excess" lands in the redevelopment project area and subsequent sale of those lands to the developer was authorized by the statutory provisions, there being no restriction on the resale of such property to other developers.
In Attorney General Opinion No. 2004-6, this office concluded that the above-cited statutes do not preclude use of STAR bond proceeds to pay the costs incurred in connection with the construction of a building or other structure, provided the building or structure is not to be owned by or leased to a developer.[26] The facts before us involve the Unified Government owning the theater, so the use of STAR bond moneys to build the theater has not been questioned. The issue you raise is whether the statutes preclude use of STAR bond proceeds to pay the costs incurred in connection with the construction of a building to be owned by the city, when the revenues generated from that building or structure are dedicated to paying "rent" to a developer under a land lease agreement wherein it appears that the only benefit accruing to the city is that the developer agrees to locate its store in the redevelopment district. Because the purpose of the STAR bond statutes is to promote and stimulate development by assisting cities to help finance redevelopment projects, and because the Act does not specifically preclude the dedication of revenues from buildings and structures that have been constructed using STAR bond moneys to provide incentives to developers, we do not believe that the Unified Government's lease, lease-back agreements violate K.S.A. 2004 Supp. 12-1773(b) and 12-1770a(q).
K.S.A. 2004 Supp. 12-1770a(q) defines "redevelopment project costs" to exclude costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer. Clearly, STAR bonds could not be used to finance the construction of the Cabela's store. Here, however, STAR bonds were used to pay for costs connected with the construction of a theater, owned and possessed by the Unified Government. How the revenues from the operation of this theater are spent is not controlled by the provisions of K.S.A. 12-1770 et seq. Providing monetary incentives to a developer from sources other than bonds issued pursuant to the TIF Act is not precluded by K.S.A. 2004 Supp. 12-1773(b) or the definition of redevelopment project costs found in K.S.A. 2004 Supp. 12-1770a(q).
Further, while individual legislators have indicated that the statutes were not intended to allow such schemes, we find nothing in the legislative history of these statutes evidencing that intent.[27] Tax increment financing was first passed by the Kansas Legislature in 1976, subsequent to a study conducted by the Special Committee on Local Government.[28] Initially, the bill proposed by this special committee authorized use of the proceeds from bonds issued under its provisions only "to acquire real property within the project area including the payment of relocation assistance, to prepare the site for redevelopment, and to finance any necessary related streets and municipal utilities."[29] The authority to also use the bond proceeds for "all necessary related expenses to redevelop and finance the specified [ ] redevelopment project" was added by the Senate Committee on Local Government.[30]
There was no discussion in the Committee minutes regarding this amendment. The language in K.S.A. 2004 Supp. 12-1770a(q) excluding certain building construction costs from the definition of redevelopment project costs has also been a part of the statutory scheme from its inception, and was a part of the bill as introduced.[31] Originally, the language appeared in K.S.A. 12-1773(b), which provided in full:
 "Any property acquired by a city under the provisions of this act may be sold or leased to any person, firm or corporation, hereinafter referred to as a developer, in accordance with the redevelopment plan and under such other conditions as may be agreed upon. Such city shall use the proceeds of special obligation bonds issued under [K.S.A. 12-1774] to acquire real property within the project area including the payment of relocation assistance, to prepare the site for redevelopment, to finance any necessary related streets and municipal utilities, and to pay all necessary related expenses to redevelop and finance the specified [ ] redevelopment project. None of the proceeds from the sale of such special obligation bonds shall be used for the construction of buildings or other improvements to be owned by such developer."[32]
In 1979, this language was amended to preclude leasing property acquired by a city pursuant to the Act to a developer.[33] No discussion of this amendment appears in the legislative history of the bill. However, a motion was made and seconded to require cities to recoup the cost of acquisition of land and improvements from the developer; this motion failed to carry.[34]
In 1980, the authority to lease property to developers was reinserted.[35] The second sentence of K.S.A. 12-1773, quoted above, was significantly amended in 1988 to remove the language detailing the appropriate uses of bond revenues and replace it with a list similar to what is now found in K.S.A. 2004 Supp. 12-1770a(q).[36] Further, the word "improvements" in the last sentence of the version quoted above was changed to "structures." As so amended, the provision read as follows:
 "Such city may use the proceeds of special obligation bonds issued under K.S.A. 12-1774, and amendments thereto, or full faith and credit tax increment bonds issued under K.S.A. 12-1774, and amendments thereto, or any uncommitted funds derived from those sources set forth in paragraph (1) of subsection (a) of K.S.A. 12-1774, and amendments thereto, to implement the redevelopment plan including, without limitation:
 "(1) Acquisition of property within the project area;
. . . .
 "(15) all related expenses to redevelop and finance the redevelopment project.
 "None of the proceeds from the sale of such bonds shall be used for the construction of buildings or other structures to be owned by such developer."[37]
The stated purpose for the 1988 amendments generally was to "simplify and enhance the flexibility of tax increment financing" and, specific to the list, "[c]larify the uses for which funds may be expended to include site preparation, streets, drainage, parking, landscaping bond principal and interest."[38] At least two proponents of the measure indicated that the change in K.S.A. 12-1773(b) to list out authorized uses of bond proceeds was intended to "broaden the definition that tax increment funds can be used for" but would not include "structures to be owned by the developer."[39]
The 1997 Legislature added the caveat that bond proceeds could not be used for the construction of buildings or other structures to be owned byor leased to a developer, and included the exception from this prohibition for "proceeds of such bonds as may be issued under subsection (a)(1)(D) of K.S.A. 12-1774"[40] and redevelopment districts including land and buildings comprising a state mental health institution closed pursuant to law.[41] In 1998, the exception to the no-buildings-or-structures-to-be-owned-by-or-leased-to-de velopers rule was narrowed to include only the Kansas Speedway project and redevelopment districts including land and buildings comprising a state mental health institution closed pursuant to law.[42] The language delineating what proceeds of bonds issued under the Act could be used for was removed from K.S.A. 12-1773 in the 2001 restructuring of the Act and was used to define the term "redevelopment project costs" and placed in K.S.A. 12-1770a.[43] Finally, in 2004, K.S.A. 12-1774(a)(1)(D) was amended to prohibit use of STAR bond proceeds to finance personal property.[44]
Nowhere in the legislative history of any of these amendments did we locate any discussion that proceeds of bonds issued under the TIF Act could not be used to build public buildings or structures, the revenues from which would be used as incentives to draw developers to the project area. The statutes appear to only restrict the first use of the bond proceeds, not any subsequent generation of dollars from the land, implements or structures built with those proceeds (such as parking fees derived from parking facilities built with STAR bond moneys).[45]
While you do not specifically raise the issue, your request begs the question of whether the $14 million in rent to Cabela's to lease a parcel of land that was already owned by the Unified Government is a proper expenditure of public funds. In analyzing similar issues, the Kansas Supreme Court has applied the public purpose doctrine. This doctrine essentially provides that a municipality may appropriate public money for private businesses or individuals so long as the appropriation promotes the public welfare and is not otherwise specifically prohibited by law.[46] Additionally, the Court has stressed that the wisdom of a particular public policy will not be decided by the courts, but must be resolved by the governing body of the municipality.[47] We do not believe that the Court would find the Unified Government's lease, lease-back arrangement with Cabela's violative of the public purpose doctrine, especially in light of the purposes espoused in the TIF Act to provide incentives to assist in development and redevelopment of certain areas and the Unified Government's expressed belief that Cabela's is the cornerstone of the Village West project.[48]
In conclusion, K.S.A. 2004 Supp. 12-1773(a) specifically allows cities to acquire land as part of a redevelopment project. Subsection (b) of that statute allows cities to sell or lease such land to developers and to use proceeds from bonds issued under the TIF Act to pay redevelopment project costs. K.S.A. 2004 Supp. 12-1770a(q) defines redevelopment project costs to include acquisition of property within the redevelopment project area. The statutes do not preclude resale of such property by the developer, for a profit, to other developers in accordance with the project plan. Further, these statutes are written to only restrict the first use of the bond proceeds, not any subsequent generation of dollars from the land, implements or structures built with those proceeds. Because the purpose of the TIF Act is to promote and stimulate development by assisting cities to help finance redevelopment projects, and because the Act does not specifically preclude the dedication of revenues from buildings and structures that have been constructed using STAR bond moneys to provide incentives to developers, we do not believe that the Unified Government's lease, lease-back agreements that are the subject of Legislative Post Audit's February, 2005 Performance Audit Report violate K.S.A. 2004 Supp. 12-1773(b) and 12-1770a(q).
Sincerely,
 PHILL KLINE Attorney General
 Julene L. Miller Deputy Attorney General
PK:JLM:jm
[1] Legislative Division of Post Audit, Performance Audit Report, Wyandotte County: Reviewing the Use of STAR Bond Moneys Associated With the Kansas Speedway and the Village West Tourism District, February 2005.
[2] Id., at 25.
[3] Id., at 22. Because it occurred prior to the time the language in K.S.A. 2004 Supp. 12-1774(a)(1)(D) (see L. 2004, Ch. 183, § 4) was passed to preclude use of STAR bond moneys for the purchase of personal property, and because the Unified Government owns the displays, this transaction is not questioned by Post Audit and is not a part of your opinion request.
[4] Id., at 21.
[5] Id., at 25.
[6] Id., at 21, 25.
[7] Id., at 25.
[8] Letter from Dennis Hays, Unified Government County Administrator, to the Honorable John Edmonds, Chairman, Legislative Post Audit Committee, dated February 25, 2005 (emphasis in original). See also
Letter from Kim B. Wells, Gillmore Bell, dated April 1, 2005.
[9] Base Lease between the Unified Government of Wyandotte County/Kansas City, Kansas and Cabela's Retail, Inc. dated November 2, 2001, as amended December 3, 2004, Sections 1.01, 2.01 and 3.01.
[10] Theatre Lease between Cabela's Retail, Inc. and the Unified Government of Wyandotte County/Kansas City, Kansas dated November 2, 2001, as amended February 7, 2003, December 3, 2004 and January 31, 2005, Sections 1.02, 2.01 and 3.01.
[11] Base Lease, supra note 9, at Section 1.02, 2.02; Theatre Lease,supra note 10, at Sections 2.02 and 4.01.
[12] Theatre Lease, at Section 16.01, 17.01; Third Amendment to Theatre Lease, Section 1a.
[13] Base Lease, Section 2.02; Theatre Lease, at Section 2.02(c).
[14] Performance Audit Report, supra note 1, at 8, 18, 21, 25, 26; letter from Dennis Hays, supra note 8.
[15] The Tax Increment Financing Act, K.S.A. 12-1770 et seq.
[16] K.S.A. 12-1770.
[17] K.S.A. 2004 Supp. 12-1771.
[18] K.S.A. 2004 Supp. 12-1771(b); 12-1772.
[19] K.S.A. 2004 Supp. 12-1770a(s). See also K.S.A. 2004 Supp.12-1771(b).
[20] K.S.A. 2004 Supp. 12-1774(a).
[21] K.S.A. 2004 Supp. 12-1774(b).
[22] K.S.A. 2004 Supp. 12-1774(a)(1)(D).
[23] Emphasis added.
[24] Emphasis added.
[25] 10 McQuillin, Municipal Corporations § 28.10 (3d ed. rev. 1999); Am. Jur. 2d Municipal Corporations, Counties, and Other PoliticalSubdivisions § 498 (Thompson/West 2005).
[26] The opinion points out that STAR bond proceeds may be used to pay costs incurred in connection with the construction of a building or structure to be owned by or leased to a developer when it is part of an auto race track facility or in a redevelopment district including some or all of the land and buildings comprising a state mental institution closed pursuant to section 2 of section 219 of the 1995 Session Laws of Kansas. K.S.A. 2004 Supp. 12-1770a(q).
[27] See Davis v. City of Leawood, 257 Kan. 512, 524-28 (1995) (post-enactment statements of individual legislators are not reliable indicators of legislative intent, and their use should not be among "legitimate methods" sanctioned for use in statutory construction). Seealso State ex rel. Stephan v. Parrish, 257 Kan. 294 (1995); Hall v. StateFarm Mut. Auto. Ins. Co., 8 Kan.App.2d 475 (1983).
[28] See Reports of Special Committees to the 1976 Kansas Legislature,Re: Proposal No. 40 — Urban Redevelopment 767 (1976).
[29] Id. at 774 and 781; 1976 House Bill No. 2666, Section 4(b); Supplemental Information on House Bill 2666, as reported by House Committee on Federal And State Affairs, 1976; Minutes, House Committee on Federal and State Affairs, January 20, 1976.
[30] Minutes, Senate Committee on Local Government, March 23, 1976; Report of Standing Committee on Local Government, page 2.
[31] 1976 HB 2666, § 4(b).
[32] Emphasis added.
[33] L. 1996, Ch. 52, § 4(b).
[34] Minutes, House Committee on Local Government, March 21, 1979.
[35] L. 1980, Ch. 68, § 3(b).
[36] L. 1988, Ch. 78, § 4(b).
[37] Id. (emphasis added).
[38] Minutes, House Committee on Local Government, February 9, 1988, Attachment 1-4, 1-5.
[39] Id., Attachments 6-3 and 8-3. See also Minutes, Senate Committee on Local Government, March 23, 1988, Attachments II and XVII; Minutes, Senate Committee on Local Government, March 24, 1988, Attachment II ("[t]he basic thrust of the tax increment financing procedure is to authorize cities to acquire land for sale to a private developer; bonds are issued by the city to finance the difference between the cost of acquisition and the sale price to the developer, plus the cost of related public expenditures, such as for public improvements. . . . The bill specifies the kinds of public improvements that may be made in the district, using tax increment moneys").
[40] I.e., redevelopment projects determined by the Secretary of Commerce and Housing to be of statewide as well as local importance, or would create a major tourism area for the state. See L. 1997, Ch. 162, § 2(a)(1)(D).
[41] L. 1997, Ch. 93, § 1.
[42] L. 1998, Ch. 17, § 5(b).
[43] L. 2001, Ch. 103, § 2.
[44] L. 2004, Ch. 183, § 4.
[45] Additionally, we are advised by bond counsel for the Unified Government that the theater was not built solely and specifically to generate revenues to be used as an incentive to Cabela's. The decision to build a theater was made, prior to any thought being given to this use of its revenues, for a variety of other reasons. See Letter from Kim B. Wells, Gilmore Bell, dated April 1, 2005.
[46] See Duckworth v. City of Kansas City, 243 Kan. 386, 387-88 (1988) (court upheld city's municipal development loans to a private developer).
[47] Id. See also Ullrich v. Board of Thomas County Comm'rs,234 Kan. 782, 789 (1984).
[48] We note that the lease, lease-back arrangement is not unique to this particular project; other entities, including public building commissions created pursuant to K.S.A. 12-1757 et seq., have utilized such agreements in an effort to avoid mortgaging public property.