NOT DESIGNATED FOR PUBLICATION

No. 128,108

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FIRST PRESBYTERIAN CHURCH OF LAWRENCE,
*Appellant/Cross-appellee*,

v.

CITY OF LAWRENCE, KANSAS,
*Appellee/Cross-appellant*,

and

FOUNTAIN RESIDENTIAL PARTNERS LLC,
*Appellee*.

MEMORANDUM OPINION

Appeal from Douglas District Court; MARK A. SIMPSON, judge. Oral argument held August 5, 2025. Opinion filed October 3, 2025. Affirmed.

*Richard W. Hird*, of Petefish, Immel, Hird, Johnson & Leibold, L.L.P., of Lawrence, for appellant/cross-appellee.

*Randall F. Larkin*, *Toni Ramirez Wheeler*, and *Zachary T. Fridell*, legal counsel, City of Lawrence, for appellee/cross-appellant.

*Greg L. Musil* and *Brett C. Randol*, of Rouse Frets White Goss Gentile Rhodes, P.C., of Leawood, and *Todd N. Thompson*, of Thompson-Hall, P.A., of Lawrence, for appellee.

Before ISHERWOOD, P.J., SCHROEDER and PICKERING, JJ.

1

PER CURIAM: This case arose out of a rather lengthy land use dispute, and the current conflict brings it back before our court for the second time. By way of background, Fountain Residential Partners LLC (Fountain) established a site plan for the development of 57 duplexes, as well as 6 detached dwellings, on a tract of land that neighbored the First Presbyterian Church of Lawrence (the Church). The plan was ultimately approved by the Lawrence City Commission (the Commission), which prompted the Church to file a petition in the district court, pursuant to K.S.A. 12-760, primarily to challenge whether the number of duplexes contemplated under the plan ran afoul of the Land Development Code (the Code) section of the Lawrence City Code. The Church accompanied its petition with motions for declaratory and injunctive relief. The motions were denied, and the Church's petition was eventually dismissed, giving rise to the first appeal in this case. A panel majority of this court determined that the Code's definition for "duplex" was ambiguous and remanded the case with directions to analyze the term *in pari materia* with the entire city code and examine any legislative history that may illuminate what the drafters envisioned as the true scope of its definition for the term "duplex." *First Presbyterian Church of Lawrence v. City of Lawrence*, No. 124,855, 2023 WL 2621133, at *1 (Kan. App. 2023) (unpublished opinion) (*First Presbyterian I*). The parties attempted to adhere to that directive, and the corresponding bench trial did not end favorably for the Church. Consequently, the matter has now returned to us to resolve the Church's claim that the district court erred in concluding that when ratifying the definition for "duplex," the Commission did not intend to restrict the development of such structures to one per lot. The City cross-appeals to challenge the district court's denial of its motion for summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Church is located in Lawrence, Douglas County (the City), and the 9.12-acre tract of land owned by Fountain that is at issue is situated directly across the street. The Fountain property is in an RSO zoning district, the nature of which is designed to serve as

a transition area between commercially heavy zones and those which are primarily residential. Accordingly, such zones are predominantly occupied by administrative and professional offices that are compatible with the aesthetic of the surrounding residential neighborhood. From a residential standpoint, RSO zones allow attached and detached dwellings, duplexes, and hybrid structures which contain a configuration of both office and residential space. Again, the plan proposed by Fountain and accepted by the Commission includes 57 duplexes (114 dwelling units) and 6 detached dwellings; it does not contemplate the development of what the Code classifies as attached dwellings.

The consistent wind for the sails of this litigation is an assessment of the full extent of the reach of § 20-1734(5) in the Code, which is the provision that purports to clarify the identifying features of a "duplex." It defines it as "[a] single Structure that contains two (2) primary Dwelling Units on one (1) Lot. The units may share common walls or common floor/ceilings." But it is the provision's arguable lack of clarity that prompted the initiation of this case, brought it before this court for consideration, resulted in its return to the district court on remand, and now reunited us with it once more. On remand from this court following the first appeal, the district court was instructed to delve deeper into the criteria that potentially informed the lawmakers' decision making for the definition of "duplex." *First Presbyterian I*, 2023 WL 2621133, at *1.

At the outset of the remand proceeding, the City and Fountain sought to have the case disposed of on summary judgment. Their motions were denied, and the matter proceeded to a bench trial. The Church presented the testimony of its representative, James Rumsey, to summarize the application of the Code and offer an overview of the structural configurations for the other RSO districts located throughout Lawrence.

Sheila Stogsdill was also called as a witness for the Church. Stogsdill served as the Assistant Director of Planning in Lawrence from 1999-2006. She explained that Lawrence adopted its first city code in 1966 and in 1999 it adopted a new comprehensive

3

plan, Horizon 2020, in conjunction with the county with an eye toward overhauling the existing city code in full. The City hired a consulting firm, Duncan and Associates (the Firm), to carry out the task of modifying the city code, and Stogsdill served as a liaison between the Firm and the City. Several of the drafts that the Firm prepared during that time were admitted into evidence as purported pre-enactment documents to illustrate how the city code was drafted. Stogsdill clarified that those drafts were never shared with or presented to either the planning or city commissions. Rather, the drafts simply reflected the evolution of the Firm's independent work product as they attempted to arrive at a version they were satisfied with presenting to both commissions. When the Church specifically inquired about any discussions Stogsdill engaged in with the Firm about the appropriate content for the definition of "duplex," Fountain and the City objected, and those objections were sustained. The district court also refused to allow Stogsdill to delve into details about how locations were selected for the designations as various districts or to share specifics from her conversations with the Firm about any factors that prompted a change in the classification of certain zoning districts.

The Church repeatedly attempted to elicit explanations from Stogsdill concerning the impetus for a modification of the city code's zoning categories. The district court consistently prohibited the line of questioning because it conflicted with the holding in *Davis v. City of Leawood*, 257 Kan. 512, 893 P.2d 233 (1995), which provides that proper legislative history is drawn from pre-enactment statements of those who drafted or voted for a law. By contrast, the import of the testimony the Church sought to extract from Stogsdill was *why* a particular course of action was taken, making it akin to inadmissible post-enactment statements.

The parties stipulated that the Firm completed and submitted its proposed updated city code for the Commission's consideration in 2003. That final version contained a definition for "duplex" that is precisely the same as that which is contained in the current Code and under scrutiny in this case—"'[a] single structure that contains two (2) primary

4

Dwelling Units on one (1) lot.'" Stated another way, the only time the definition was presented to the Commission was after the Firm was satisfied it had successfully completed the overhaul of the city code that it was hired to perform. The parties agreed that the members of the Commission never saw or weighed in on any of the preceding versions of the definition that the Firm may have drafted during the Code's gestational period.

None of the parties presented the district court with any evidence to establish what objectives the Firm sought to achieve or criteria it was required to consider when crafting a definition for the Commission's approval. The district court also did not receive any evidence from any of the invested parties that the members of the Commission subjected the "duplex" definition to any substantive discussion or that the administrative body proposed any modifications or amendments to the provision before recommending approval of the Firm's modified city code. The Commission ultimately approved the revised city code in 2006.

At the conclusion of the proceeding the district court took the matter under advisement and ultimately issued an extensive written ruling that independently addressed each of the points this court directed the parties and the district court to consider on remand. The district court first noted that the historical understanding of the Code fleshed out at the bench trial was of minimal, if any, assistance in determining legislative intent. Additionally, given that the Commission received only a single draft to consider, and the definition contained therein was not appreciably different from the current definition, there was not any legislative history that could be relied on to lend clarity to or provide an understanding of the chosen language. The district court stated:

> "The April 2001 draft definition was ultimately changed by Duncan and Associates from
> 'A duplex is a building that contains two principal dwelling units on a single lot' to the
> current 'A single Structure that contains two (2) primary Dwelling Units on one (1) Lot.'

5

City Code § 20-1734(5). That change does not materially alter the meaning of the definition. Regardless, the change in draft language by Duncan and Associates tells us nothing about the legislative intent of the City Commission because the change was made even before the draft was presented to the Planning Commission or the City Commission and the reasons for the change are unclear."

The district judge did find it notable that the site plan at issue in this case marked the only proposal submitted to the City since 2006 which contemplated multiple duplexes on one lot in an RSO district. In other words, at no time had an application been submitted for a site plan which sought to develop multiple duplexes on one lot in an RSO district but was ultimately rejected.

The district court derived some measure of understanding from an analysis of the treatment afforded to duplexes within various zones throughout Lawrence. Beginning with the non-RSO zones, five such districts included locations which had multiple duplexes on the same lot. The judge observed that, by contrast, Lawrence had six RSO zones with duplexes and at each of those locations the individual duplex was situated on its own lot. Stated another way, none of those RSO zones had multiple duplexes on one lot. The residential multi-dwelling (RM) districts presented the district court with a useful distinction. For example, in the RM12D district the building type is restricted to duplexes or attached dwellings of two units. Duplex construction is expressly limited, under § 20-204(a)(3) of the Code, to one "Principal Building per lot." This information prompted the district court to find that when the Commission intends to limit the number of duplexes per lot, it understands how to accomplish that task.

The district court concluded that the definition of a "duplex" was drafted with the intent to clarify what structures fall under that header, primarily to differentiate them from "attached dwellings" or townhomes, not regulate how many can be developed on a lot. The regulatory aspect was instead accomplished through the adoption of density requirements in each zone. For example, the RM12D district is distinguished not solely

6

by the basis of permissible building type, but also the maximum allowable net density in those zones. As it related to the specifics of this case, the district court noted that the maximum density for RSO districts is 15 dwelling units per acre. Accordingly, since Fountain's plan measured out at 13.16 dwelling units per acre, it registered below the maximum density standards for RSO districts and did not violate the Code. To that end, the site plan proposed by Fountain and approved by the Commission did not offend any restrictions contained within the Code.

The Church now returns the case to our court for an assessment of the district court's analysis and a determination of whether it erred in entering a ruling in favor of the City and Fountain.

LEGAL ANALYSIS

I. *Did the district court err by excluding certain testimony from a former assistant planning director for the City of Lawrence?*

The Church asserts that the district court erred when it sustained objections from the City and Fountain and then declined to allow Stogsdill to testify as to why, at the time the Code was rewritten, a point of critical importance was to create new zoning districts, specifically RSO and RMO districts—residential single-dwelling office and residential multi-dwelling, respectively. The City and Fountain counter that the testimony was irrelevant because it had little to no probative value of legislative intent. Fountain additionally asserts that the Church failed to fulfill a preservation requirement when it neglected to submit its necessary offer of proof at the time Stogsdill's testimony was excluded. Notably, the Church did not contest Fountain's lack of preservation claim when it filed its reply brief. We agree that the issue is not properly before us for review.

Stogsdill was the primary witness called by the Church and testified at length concerning the role she played as the liaison between the Firm and the planning

7

commission during the overhaul of the Code. Stogsdill also testified extensively about various provisions within the Code. Satisfied that it successfully established the foundation for and the breadth of Stogsdill's knowledge, the Church endeavored to establish a finer point for some of the areas she initially only addressed more generally. In so doing, counsel for the Church inquired of Stogsdill why it was "important to make this difference between RSO and RMO at that time." Stogsdill began to explain, but Fountain quickly interposed an objection on the grounds that the inquiry probed into *why* the Code was adopted and, as such, strayed into territory the district court previously determined was off limits. The City joined in the objection. The Church countered that the line of questioning did not contravene the district court's earlier ruling because it simply sought to shed light on "the circumstances surrounding the passage of the Code, and the changes that were made, and to explain why two zoning categories were collapsed into one." The district court sustained the objection upon finding that testimony about why something was done amounted to a post-enactment statement from someone who was involved in the drafting of the Code, which is expressly prohibited by *Davis*, 257 Kan. 512. Counsel for the Church did not enter a proffer into the record to detail what Stogsdill's answers to the forbidden questions would have been if she had the opportunity to answer; he simply resumed his questioning of the witness.

K.S.A. 60-405 codifies the proffer requirement for appellate review, stating:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

The Kansas Supreme Court has clarified that the import of the provision is to advise the party affected by the exclusion of evidence that they bear the responsibility to proffer sufficient evidence to the district court in order to preserve the issue for appeal.

8

*State v. Hudgins*, 301 Kan. 629, 651, 346 P.3d 1062 (2015). The nature of the proffer is not bound by any particular formalities and is sufficient so long as it clearly details the substance of the excluded evidence by way of the parties' arguments or in-court dialogue. *In re A.K.*, 320 Kan. 805, 813, 572 P.3d 763 (2025) (citing *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 [2015]). A formal offer of proof is not required when an adequate record is made, which discloses the evidence the party seeks to introduce. *State v. White*, 316 Kan. 208, 212, 514 P.3d 368 (2022). The problem is that the Church failed to follow either of the two avenues available to it in this case.

Again, after the objection was sustained, counsel for the Church simply resumed his direct-examination of Stogsdill and nothing from that exchange can arguably be said to shed any light on the Church's issue on appeal—why the Firm felt compelled to draw a distinction between the RSO and RMO districts when the Code was rewritten. Thus, an adequate record was not made to disclose the nature of the evidence the Church sought to present to the district court. Consequently, in the absence of a proffer concerning the precise evidentiary matter the Church has requested this court to analyze on appeal, the issue has not been preserved for our review, and its merits will not be considered.

II. *Did the district court err by finding that there was no legislative history for the ordinance?*

The Church argues that the district court reached its conclusion in error when it determined there was no legislative history for the ordinance offered during the remand hearing. It contends that Stogsdill's testimony and the early drafts of the Code provided the district court with the resources it needed to accomplish the directive this court issued on remand from the first appeal to specifically delve into the legislative history of the ordinance. Fountain and the City counter that the early drafts relied upon by the Church cannot be characterized as legislative history because there is no evidence the Commission ever had those drafts at its disposal to view, analyze, or discuss when it

9

conducted its assessment of the updated Code. Rather, that governing body only reviewed the final draft prepared by the Firm and rested its approval on that version alone.

Our standard of review for the questions presented here is whether substantial competent evidence supports the district court's factual findings and whether those factual findings support the court's legal conclusions. *State v. Riffe*, 308 Kan. 103, 109, 418 P.3d 1278 (2018).

Before moving into an examination of the issue, we should identify the fundamental legal principles that guide our decision making. *First Presbyterian I* directed the parties to identify and analyze any legislative history that bears on the issue to be decided—what was contemplated when crafting a definition for the term "duplex."

"Legislative history" contemplates the pre-enactment statements of those who drafted or implemented a law. *District of Columbia v. Heller*, 554 U.S. 570, 605, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). That term encompasses the historical background of the provision, its associated legislative proceedings, and any changes the provision realized during the course of its enactment. *Hand v. State Farm Mut. Auto. Ins. Co.*, 2 Kan. App. 2d 253, 256, 577 P.2d 1202 (1978). The relevant "changes made" are those effectuated by the governing body over the course of its committee meetings, debates, revisions, and re-drafting. The fact the members added or deleted language as part of a collaborative dialogue is what enables the resource to be viewed as a valuable tool for illuminating the intent that drove their decision making. See 82 C.J.S. Statutes § 436. It seemingly follows that drafts the collective body never had the opportunity to review or discuss cannot be said to have informed its intent when contemplating the enactment of a law or alteration of an existing law.

After the lengthy remand hearing and following a review of the evidence adduced and multitude of admitted exhibits, the district court determined there was not any

legislative history presented which exposed the underlying rationale for the definition of "duplex" that was adopted. It specifically noted the absence of any "committee reports, pre-enactment staff reports, or pre-enactment statements by City Commissioners regarding the legislative intent behind the definition of duplex."

In support of its contention that the district court erred in reaching the conclusion that it did on this issue, the Church first directs our focus to Stogsdill's explanation of certain changes that occurred when the Code was revised in 2006 to replace the initial version that was drafted in 1966. Stogsdill testified that the earlier classifications of the RO-2 and RO-1B districts were absorbed by the RSO district in the modified city code, paving the way for the development of a lower density buffer district between single-family and higher intensity uses.

The transcript reflects this is where the City and Fountain voiced their objections. Even so, the Church asserts that the testimony Stogsdill provided before those objections offered valuable legislative history. As support, it notes that Stogsdill also highlighted a 2001 draft of the Code revision which allowed duplexes on corner lots in residential single-dwelling (RS) districts and defined duplex as "a [b]uilding that contains two principal [d]welling [u]nits on a single [l]ot." But we note this definition was ultimately eliminated in exchange for the current version before it was ever presented to the Commission for its consideration. That is, there is no aspect of Stogsdill's testimony or information set forth in the 2001 draft she referenced which serves to illustrate that the way "duplex" is currently defined is an evolution borne of active, learned discussion by the Commission as required to fall within the ambit of what is properly characterized as "legislative history."

The mere existence of preliminary versions drafted by the Firm offers no insight into what the actual Commission, as Lawrence's law making body, intended to accomplish through its approval of the definition. The landscape would be decidedly

11

different if the Firm provided the Commission with varying proposed definitions for a "duplex" and the Commission voted in favor of one while rejecting others. But there is no indication the Commission was even aware the earlier versions existed; Stogsdill was simply a liaison, she was not part of the legislative body that ultimately passed the ordinance.

We are not persuaded that Stogsdill's excluded testimony carried the potential to reveal relevant legislative history. While it described *what* transpired, her role prevented her from offering any insight as to *why*, which is the critical issue that needs to be resolved. We are unable to assign any measure of error to the district court's conclusion that it was not provided with any legislative history during the hearing given the fact no committee reports, pre-enactment staff reports, or pre-enactment statements by city commissioners were discussed or introduced.

III. *Did the district court err in its construction of the definition for "duplex"?*

The parties maintain the respective positions they have held throughout this protracted litigation as it relates to the definition. That is, the Church contends the ordinance restricts development of the tract to a single duplex on one lot. A one-to-one ratio that either requires: (1) Fountain to amend its site plan to draw 57 lots for its 57 duplexes, or (2) the City to rescind its prior approval of the developer's site plan. Fountain and the City assert that the Church failed to provide evidence to substantiate its interpretation for the definition, and when the language approved by the Commission is reviewed *in pari materia* with the rest of the city code it supports the district court's ruling.

Again, when reviewing a mixed question of law and fact, an appellate court applies a bifurcated review. Factual findings are filtered through the substantial competent evidence standard. Any conflicting evidence or other inferences that might be

drawn from the evidence are disregarded. We then conduct an unlimited review of the conclusions of law derived from those factual findings. See *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017).

To the extent resolution of the issue requires us to undertake an interpretation of a statute we will also give the matter unlimited review as such inquiries require us to resolve a question of law. *Roe v. Phillips County Hospital*, 317 Kan. 1, 5, 522 P.3d 277 (2023).

The crux of the Church's contention has consistently been that the definition of "duplex" contained within the Code does not permit development of the subject tract of land in the manner Fountain proposed and the City approved. Thus, the overarching objective for the *First Presbyterian I* panel was to attempt to discern both the intent of the provision's drafters, as well as the purpose of the ordinance, and give effect to both components. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022).

The *First Presbyterian I* majority adhered to its obligation to refrain from speculating as to legislative intent and declined to read anything into the provision that was not readily found therein. 2023 WL 2621133, at *1. It conducted as extensive of an analysis as the record would allow. However, the original appeal was a product of the district court's dismissal of the Church's petition under K.S.A. 60-212(b)(6) for failure to state a claim. Consequently, the record available to the *First Presbyterian I* panel was rather scant and undeveloped with respect to many of the particularized inquiries required to resolve the Church's claim. Accordingly, the majority found that based on the limited amount of information available, the interpretations both parties offered for "duplex" were plausible. The panel rejected what it perceived to be a flawed grammatical argument advanced by the Church, but not the Church's lexical contention that inclusion of the word "single" in the ordinance could mean that the Code intended each duplex to be the only structure on its lot, making each one a single structure.

13

The City and Fountain contrasted the definition of duplex against the definition of "Attached Dwelling." *First Presbyterian I*, 2023 WL 2621133, at *4-5. The dissent posited the construction of "triplexes," or a string of three attached dwellings. Then, depending on how lot lines were drawn, the same building would simply be given another name, specifically a multi-dwelling structure.

The Code defined an attached dwelling at § 20-1734(2) as: "'A Dwelling Unit, located on its own Lot, that shares one or more common or abutting walls with one or more Dwelling Units. An Attached Dwelling does not share common floor/ceilings with other Dwelling Units. An Attached Dwelling is also called a townhouse or a row house.'" *First Presbyterian I*, 2023 WL 2621133, at *4. Thus, for reasons that are not immediately transparent, the Commission adopted a definition for attached dwellings/townhouses that contemplate placement on their own lots.

In contrast, a multi-dwelling structure contains three or more dwelling units that share common walls or floor/ceilings with one or more units. *First Presbyterian I*, 2023 WL 2621133, at *12 (Atcheson, J., dissenting). It further provides at § 20-1734(8) of the Code that: "The land underneath the Structure is not divided into separate Lots. A Multi-Dwelling includes Structures commonly called garden apartments, apartments and condominiums."

The triplexes discussed by the majority and dissent in *First Presbyterian I* are not in the same *ejusdem generis* as garden apartments and condominiums but would nevertheless fall within the Code's definition for multi-dwelling structures. In a triplex, the three dwelling units would not share common floor/ceilings, but each would share a common wall with another dwelling unit. Since the definition uses the disjunctive "or," the three dwelling units would meet the definition of a multi-dwelling structure by sharing common walls even though they did not share floor/ceilings. If a developer drew lot lines between the dwelling units, then a triplex would meet the definition of an

14

attached dwelling. If not, it would be a multi-dwelling structure. Attached dwellings are permitted in RSO districts. Multi-dwelling structures are not. Triplexes with individual lots for each attached dwelling are permitted in RSO districts, while those without such lots are not permitted.

This prompted a finding by the *First Presbyterian I* majority that given the fact some degree of emphasis was placed on the existence of lot lines, there was a possibility that the Commission adopted the Code with an eye toward inclusion of those boundaries as a requirement separate and apart from density. Yet any justification for such a requirement was not readily discernible due to the underdeveloped state of the record.

Thus, the *First Presbyterian I* court remanded the case and directed the parties to flesh out the legislative history and the historical application of the provision, to employ the canons of construction as necessary, and afford consideration to the entire city code as may be relevant to establish the context in which the language of the duplex definition is structured. 2023 WL 2621133, at *1.

The record before us bears out that the district court endeavored to adhere to the directives of that mandate and considered the city code's historical background, legislative history, historical application, and canons of construction. As noted in the preceding issue, the district court concluded that no evidence of any sort of legislative history was offered to illustrate the evolutionary pathway of the definition or the thought processes of the Commission which necessarily molded the language into its final form. The district court further found there was likewise an absence of evidence that the approved definition was the product of any historical influences. As stated previously, we are satisfied that both conclusions are supported by substantial competent evidence. Two categories remain, and following a thorough analysis of each we are not persuaded that either of those yield an outcome that favors the Church's position.

*Historical Application*

The manner in which a legislative body has applied its own texts over time may offer some insight into its desired interpretation for its current provisions. Similarly, when that governing body takes two related actions concurrently, it is unlikely it intends to establish conflicting directives. See, e.g., *Marsh v. Chambers*, 463 U.S. 783, 788-89, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983) (A constitutional amendment would be unlikely to conflict with the statute passed by the same legislature three days earlier.). Here, if the Commission passed the ordinance and then promptly approved a development plan for duplexes that shared a lot, it would stand as a fair indication that the Commission did not intend for duplexes to be limited to one per lot or vice versa.

The parties presented the district court with several exhibits to illustrate the varying treatment duplexes have received within RSO and non-RSO districts. One of those examples involved an area established in 2018 that includes multiple duplexes on the same lot. While, candidly, this site was not located within an RSO district, it was constructed 12 years after the ordinance passed. Thus, the definition for "duplex" that is currently at issue was already adopted by the Commission at the time that site was developed. Other exhibits depicted developments with duplexes on shared lots, but which were built before the Code was overhauled. Yet, no evidence was offered to establish that these locations were grandfathered in and simply bear the label of a nonconforming use. It is undisputed that each RSO lot containing duplexes has only one duplex per lot. But we must also bear in mind that the only application which has ever sought to place multiple duplexes on one lot in an RSO district is the site plan Fountain submitted in this case.

The Church takes the position, as it did before the district court, that developments with duplexes on the same lot are irrelevant to the inquiry because they are not in RSO districts. But when the Commission approved the ordinance, it did so intending that one

16

definition would apply equally throughout the entire city code. The parties' exhibits demonstrated for the district court that Lawrence has six locations, each in an RSO district, which have one duplex per lot, but also five locations in non-RSO districts where multiple duplexes share the same lot. The district court correctly determined that the existence of developments with multiple duplexes on the same lot tends to indicate that such developments do not undermine the intent of the ordinance.

The district court opined that this evidence offered only a weak inference at best and that "the historical application of the City Code does not provide much assistance in determining the legislative intent." While not overwhelming, the evidence nevertheless tips the scale in favor of Fountain and the City for this factor.

*Canons of Construction*

We, like the district court, find that this factor bears the lion's share of the weight in formulating a resolution for this issue. We are satisfied with the rather meticulous *in pari materia* analysis conducted by the district court. First, it undertook a comparison of RSO and RM districts. Pursuant to §§ 20-203, 20-204 of the Code, the latter district allows multi-dwelling housing while RSO districts do not. Additionally, the density requirements for RSO districts restrict developments to 15 dwelling units per acre. By contrast, RM districts are divided into four categories, with the RM32 district boasting the highest density and allowing 32 dwelling units per acre. The remaining three categories allow 12, 15, and 24 dwelling units per acre.

The district court's comparison is particularly helpful when addressing the distinction between the RSO, RM12, and RM12D districts. At § 20-204(a)(3) the Code states:

"The RM12D District is differentiated from the other RM Districts on the basis of Building Type and the maximum allowed Net Density. In the RM12D district, the Building Type is restricted to Duplexes or Attached Dwellings of 2 units. Only one Principal Building per Lot is permitted in this District."

Under this provision, RM12D districts only allow one duplex per lot as the sole principal building. From this language, the district court concluded that the Commission knew how to impose limitations on the number of duplexes per lot when that was its intention. It reasoned that the language limiting one duplex per lot in RM12D districts would be redundant if the Code's definition of "duplex" already necessarily imposed a universal limitation of one per lot. We concur with the district court's construction of these provisions. Accordingly, a developer that seeks to construct duplexes in RM12D districts must establish lot lines between each structure. The only reasonable explanation for this requirement is that developers do not face a similar requirement when constructing duplexes in other districts.

The district court then turned to the density implications of Fountain's site plan and observed that while the 9.12-acre tract allowed for a maximum of 135 dwelling units, the plan only contemplated a total of 120 dwelling units. It concluded that the plan conformed with the Code given that the Commission chose to regulate the number of dwelling units per lot through the use of density standards. The district court concluded it would be nonsensical "for the City Code to regulate density for duplexes through the definition of duplex but regulate density for other dwellings through the maximum density standards."

The Church attempts to undermine the validity of the district court's determination by arguing that density and lots involve separate requirements. That is generally a correct statement, as *First Presbyterian I* recognized, but mandatory lot lines combined with minimum lot sizes can nevertheless impact density.

18

The Church properly highlights that Article 6 of the city code regulates density and its per-acre density limitations for an RSO district would equally apply to attached dwellings. Fountain's site plan proposes 120 total dwelling units, 12 of which will run along Clinton Parkway in the form of 6 duplexes. But a different configuration illustrates why lot line requirements differ from density requirements. If Fountain had instead proposed the development of 12 attached dwellings along Clinton Parkway, then it would be required to draw lot lines between each attached dwelling, per the definition for those structures under § 20-1734(2) of the Code.

The use regulations set forth under § 20-503(3) of the Code establish special lot standards. These use regulations reduce the minimum setback requirement to zero for the side of the dwelling unit containing a common wall. Lawrence City Code § 20-503(2)(iii)-(iv), (3)(iv)-(v). This allows attached dwellings to share lot lines so that the imaginary lines can pass through the walls between dwelling units. Code § 20-503(3)(i) also limits attached dwellings to nine per structure. Thus, the site plan would need to propose 12 attached dwellings as two structures of 6 dwelling units each, or three structures with 4 dwelling units each, or some other combination where no structure exceeds 9 dwelling units. As long as Fountain drew lot lines between no more than nine attached dwellings per structure, then the Commission could approve the site plan because attached dwellings are permitted in RSO districts.

Thus, the Church is correct that the density would be exactly the same even though the developer would need to divide the property with lot lines. So here, the site plan would still have 120 dwelling units overall, on a 9.12-acre lot which can accommodate a maximum of 135 dwelling units. Stated another way, the density requirement of RSO districts is 15 dwelling units per acre. The site plan would still have 15 dwelling units or fewer per acre. Modifying the site plan from six duplexes to 12 attached dwellings would not result in any change in density because the Code does not regulate density by requiring lot lines for each attached dwelling. See Lawrence City

19

Code § 20-503(3)(ii) (specifying that the density requirements of the base district still apply). The Church is generally correct that lot lines are not the same as density. A developer could propose a site plan of attached dwellings that meets density requirements but fails on lot lines. But this point does not end the argument.

We would also note that in advancing its argument, the Church fails to recognize a key distinction between attached dwellings and duplexes. There are exceptions in the use regulations for attached dwellings set out at Chapter 5 of the Code. By contrast, duplexes do not even appear in Chapter 5 and enjoy no reductions in use regulations allowing smaller lots or reducing setbacks. This disparate treatment between lots for attached dwellings and those for duplexes illustrates the accuracy of the district court's ruling on the next point.

The district court held that, although the minimum lot requirement in an RSO district is 5,000 square feet, it does not have a corresponding maximum lot size. Rather than limiting the size of each lot, density in RSO districts is, again, regulated by dwelling units per acre. In this way, RSO districts are more like the RM districts than the RS districts. All single residences in Lawrence have a minimum lot size per dwelling unit but none have a maximum number of dwelling units per acre because density simply is not measured in that way in the RS districts. The RM districts are just the opposite. Rather than a minimum lot area per dwelling unit they have a maximum number of dwelling units per acre. In this way, the Code treats the duplexes in RSO districts like multi-dwelling structures in RM districts—they do not have separate lots and must be measured by dwelling units per acre.

The district court correctly concluded that the Code does not regulate the number of residential structures per lot through its definitions section. Thus, it properly entered a ruling in favor of the City and Fountain. That is also the first reason why it is unnecessary for us to review the merits of the City's cross-appeal, which only challenges the district

court's denial of its request for summary judgment. Our second justification for declining to undertake an analysis of the City's claim is that a party generally "may not 'appeal an order denying summary judgment'" after trial "because that 'order retains its interlocutory character as simply a step along the route to final judgment.'" *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 490, 350 P.3d 1091 (2015) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184, 131 S. Ct. 884, 178 L. Ed. 2d 703 [2011]). "A party who has lost on summary judgment may preserve legal issues or defenses for appeal by incorporating them into a trial motion for judgment as a matter of law." *Evergreen*, 51 Kan. App. 2d at 490 (citing K.S.A. 2013 Supp. 60-250[a][1] and K.S.A. 2013 Supp. 60-252[c]). "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz*, 562 U.S. at 184.

The parties had sufficient opportunity to present their *in pari materia* arguments along with any evidence available to buttress their respective positions. We have conducted a thorough analysis of the issues raised for our consideration and detect no error in the district court's finding that no evidence of either legislative history or historical background of the provision was presented at the remand hearing. Finally, our construction of the "duplex" definition aligns with that of the district court; we concur that the Code does not restrict the development of such structures to one per lot.

Affirmed.